# United States Court of Appeals
## For the First Circuit

No. 08-2108

UNITED STATES OF AMERICA,
Appellee,

v.

FÉLIX ALBERTO CASTRO-DAVIS, a/k/a Belto, a/k/a Bertito,
Defendant, Appellant.

No. 08-2109

UNITED STATES OF AMERICA,
Appellee,

v.

FÉLIX GABRIEL CASTRO-DAVIS, a/k/a Gaby,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Circuit Judge,
Baldock,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Alan D. Campbell, for appellant Félix Alberto Castro-Davis.
Andrew S. Crouch, for appellant Félix Gabriel Castro-Davis.

---

* Of the Tenth Circuit, sitting by designation.

Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee.

---

July 16, 2010

---

**TORRUELLA**, **Circuit Judge**. This is an appeal from the convictions of Defendants-Appellants Félix Alberto Castro-Davis ("Alberto") and Félix Gabriel Castro-Davis ("Gabriel") (collectively "defendants").[1] Alberto and Gabriel were found guilty of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371, aiding and abetting a carjacking resulting in death, in violation of 18 U.S.C. §§ 2119(3) and 2, and using or carrying a firearm in connection with a carjacking, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. They appeal their convictions based on the sufficiency of the evidence, the introduction of defendants' statements against co-defendants, the making of prejudicial statements by the prosecution, and flawed jury selection and sentencing procedures.

After careful consideration, we affirm the convictions of both defendants, but vacate their sentences and remand to the district court.

---

[1] These two cases were consolidated with United States v. Figueroa Cartagena, No. 08-2110, and argued before this court on November 2, 2009. Although the issues presented in all three appeals are substantially similar, we opt to decide the cases separately. See, e.g., United States v. Caraballo, 552 F.3d 6, 7 n.1 (1st Cir. 2008).

# I. <u>Background</u>

## A. Factual Background[2]

On the morning of July 15, 2006, Héctor Pérez-Torres ("Pérez") left his home in Caguas, Puerto Rico at 11:00 am to drive his bolita route.[3] Pérez had been a bolitero for many years, and was driving his wife's 1986 Mazda 626 along his usual route, where he would stop to collect lottery bets. He was seen later that day, around 3:00 or 4:00 p.m., at the Farmacia San Antonio, which was a regular stop on his route, by pharmacist Brenda García-Medina ("García"). The pharmacy is located in and adjacent to a section of the town called El Salchichón, and connected to it by means of a secluded road, which is surrounded by dense vegetation. Later, Pérez's car was seen driving through El Salchichón, although witness Jannette Ocasio-Ortiz ("Ocasio") testified that the car she recognized as belonging to Pérez was not being operated in the usual way. While Pérez would ordinarily drive very slowly and honk his horn to allow those who wished to play the bolita to approach him, on July 15, 2006 the car was driving very quickly. Ocasio also testified that, although she could not see who was driving the car, she noticed that the silhouette of the driver was too tall to be Pérez.

---

[2] These facts are drawn from the trial transcript, based on the findings of a reasonable jury.

[3] The "bolita" is an underground lottery. Pérez was a "bolitero," or numbers runner.

Later that evening, José Figueroa-Cartagena ("José") was in his home when he received a telephone call from his sister, Neliza. Neliza asked José to step outside, because defendant Gabriel wanted to speak with him. José complied and spoke with Gabriel, who offered José money to watch Pérez's car, with Pérez inside. José agreed and allowed Alberto, who was driving Pérez's Mazda, to park the car underneath a tent José used in his automotive repair business. Pérez was in the back seat.

Alberto and Gabriel proceeded to search the car, and José testified that he witnessed Alberto remove a revolver from the car and place it on the roof. Though defendants did not appear to remove anything else from the car, José testified that he overheard them having a discussion about an ATM card they found on Pérez's person. José also testified that Alberto bragged to him about the speed of the car, and told him that they had taken it "policeman style." When asked what that meant, José explained that he understood this phrase to mean "that they stopped the car . . . with the weapon, and they said, this is the police."

Alberto and Gabriel then left the area to attempt to withdraw money using Pérez's ATM card, leaving José to watch over Pérez, who remained in the back of his Mazda.

Alone with Pérez, José fielded several requests from his captive which included rolling down the windows and getting him a

drink of water. At this point, José noticed that Pérez was handcuffed.

While guarding Pérez, José placed a call to defendants, and spoke with Neliza, who assured him that they would return soon.[4] Shortly thereafter, Pérez attempted an escape, which resulted in a struggle between him and José. In the course of the struggle, Pérez shouted: "Help, they want to kill me." As José fought with Pérez, Alberto, Gabriel, and Neliza arrived. Alberto and Gabriel helped subdue Pérez. Hearing the ruckus, two neighbors, Laura Ramos-Ortiz ("Ramos") and Celestina Montañez-Borges, approached to inquire what was happening. José told them not to worry and not to call the police. Then, Neliza again told the two neighbors to leave. When they attempted to move in closer, Neliza and Gabriel closed a gate that divided the properties to prevent the neighbors' access.

After this incident, which occurred approximately fifteen to twenty minutes after Pérez was left in José's custody, José drove away to a gas station. There, he washed the mud off of his car and drank a beer. Gabriel and Alberto arrived with Neliza soon thereafter in two separate vehicles. Neliza exited her Grand Vitara sport utility vehicle, to check on José. Alberto, Gabriel,

---

[4] José testified that he intended to speak with Gabriel, but it was Neliza who answered the phone. It is unclear whether she answered Gabriel's phone, or if José accidentally called his sister's phone.

and Pérez remained in Pérez's Mazda. José testified that he saw that Gabriel had Pérez in a headlock. After briefly speaking with José, Alberto, Gabriel and Neliza left the gas station in the manner they arrived, and drove off in the same direction.

Later that night, as she was falling asleep, Pérez's wife, Luz Rosario-García ("Rosario"), was startled by the sound of intruders. She investigated and found a young man, whom she described as tall and skinny, in her home. The man called Rosario by name and told her to calm herself. He also stated that if she shouted, she would get both herself and the man killed. Rosario then encountered a second intruder, whom she described as tough-looking, and wearing a mask and gloves. Rosario testified that she observed that the second intruder had a firearm, though she did not know what kind it was. The intruders asked for her ATM card, which she procured for them. They also asked for her personal identification number to activate the card, and when Rosario began to recite the number, which was the same as her husband's, the second intruder indicated that he already knew it. Rosario testified that the intruders then asked for access to her husband's moneybox, and when she told them that they would have to wait for Pérez to return, they informed her that they had kidnaped him. After the intruders left, Rosario found that they obtained entry to her home by using her husband's keys, which they abandoned.

The next day, July 16, 2006, José saw Neliza and Gabriel again at his home. Gabriel stated that they "had to kill him," referring to Pérez, because "it got real difficult for us and he struggled a lot." Gabriel explained that, although Alberto had a gun, they chose to asphyxiate Pérez with duct tape, because they did not want to get the gun dirty. José testified that both Neliza and Gabriel instructed him to speak with the neighbors that attempted to intervene on the previous day, and to secure their silence, if necessary, with threats.

## B. The Investigation

Pérez's body was found on July 17, 2006 in the backseat of his Mazda in Caguas. The cause of death was mechanical asphyxiation from the duct tape on his face. State agents contacted José regarding the events outside his home. Although he did not cooperate at first, he later agreed to speak candidly about the incident.

Agents from the Federal Bureau of Investigation ("FBI") presented Rosario with a spread of photographs, the third depicting Gabriel. She stated that she recognized the man in the third photo from her neighborhood. She also stated that he resembled the unmasked intruder in her home, even though he appeared thinner in person than in the photograph. Documenting her impressions for the agents, she wrote and signed a note that stated: "With reference to

number three, he looks alike, but I cannot identify whether this is the young man who entered my home."[5]

FBI agents arrested Gabriel and interviewed him. When asked about his relationship to Neliza, Gabriel stated that she was his girlfriend. Agents questioned Gabriel about the murder of Pérez, but Gabriel denied any knowledge or involvement. When asked why he had been seen fighting with the victim, Gabriel stated that Neliza's neighbors were trying to frame him. The agent pointed out to Gabriel that he had not said where the fight took place. Gabriel continued to deny everything.

On April 25, 2007, during his pre-trial incarceration, Alberto spoke to his mother, Carmen Davis, over the telephone. The conversation was recorded. During the course of this conversation, Alberto told his mother that "Neliza is the one who is talking," and "That bitch is going to fuck us over." As to Gabriel, he stated, presumably in reference to the police: "They have a picture of him and everything. I saw it."

---

[5] At trial, Rosario again was not able to make a definite identification, but stated that the photo resembled the unmasked intruder:

> [Prosecution]: So what you're telling us is the young man who came into your house looked a lot like this young man in this photo . . . but he was skinnier; is that right?

> [Rosario García]: Correcto, because when he turned the lighter [sic.] on, I tried to look at him to see who he was. Correcto.

-9-

## C.  Procedural History

On April 25, 2007, a grand jury in Puerto Rico returned a three-count indictment charging all three defendants with one count each of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371; carjacking, in violation of 18 U.S.C. §§ 2119(3) and 2; and the use and carrying of a firearm during a violent crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.

The case proceeded to a jury trial on March 5, 2008. During the jury selection process, the district court judge asked counsel whether there were any challenges to potential jurors for cause.  After two for-cause challenges, the judge asked whether counsel wished to exercise any peremptory challenges.  But, the judge immediately assigned two jurors to act as alternates, essentially combining the regular and peremptory challenges.  It is uncontroverted that this violated Rule 24 of the Federal Rules of Criminal Procedure, which requires separate regular and peremptory challenges for ordinary jurors and alternates.  Fed. R. Crim. P. 24(c)(4)(A).[6]

---

[6]  Neither Alberto nor Gabriel appeal on this issue, but we note that this issue has been before us on other occasions. See, e.g., United States v. González-Meléndez, 594 F.3d 28, 33-34 (1st Cir. 2010).  While the Supreme Court "has indicated that mistaken denials of peremptory challenges do not ordinarily warrant automatic reversal," id. (quoting Rivera v. Illinois, 129 S. Ct. 1446, 1455 (2009)), district court judges should refrain from committing this error in the future.

At trial, a recording of Alberto's telephone conversation with his mother was introduced over defendants' objections, as was Gabriel's statement to agents which referred to Neliza. The judge's instructions to the jury did not limit either the relevance of Alberto's recorded conversation or Gabriel's statements to federal agents.

The jury returned a guilty verdict on all counts against Gabriel and Alberto. They were sentenced to 60 months under the conspiracy count to be served concurrently with life imprisonment as to the carjacking count, and an 84 month consecutive term for the firearms count. Gabriel and Alberto timely appealed their convictions on grounds of insufficiency of the evidence, certain evidentiary rulings made by the district judge, a violation of Fed. R. Crim. P. 24(c)(4)(A), and statements made by the prosecutor during closing argument.[7]

## II. Discussion

### A. Sufficiency of the Evidence

Alberto and Gabriel deny that the government presented sufficient evidence against them to find each element of the offenses beyond a reasonable doubt. We thus review de novo "whether, taking the evidence in the light most favorable to the

---

[7] While only Alberto initially appealed his sentence based on the district court's misapplication of the sentencing guidelines, we allowed Gabriel to adopt the argument, as the mistakes were concurrent.

-11-

jury verdict, a reasonable factfinder could have found the defendant[s] guilty beyond a reasonable doubt." United States v. Rodríguez-Berríos, 573 F.3d 55, 65-66 (1st Cir. 2009).  We do not "weigh evidence or make credibility judgments," but rather "must uphold any verdict that is supported by a plausible rendition of the record." United States v. Ofray-Campos, 534 F.3d 1, 31-32 (1st Cir. 2008)(citation omitted).

### 1.  Conspiracy

Alberto and Gabriel were charged under 18 U.S.C. § 371.[8] To support a conviction under a conspiracy charge, the government must show that a defendant had both the intent to agree to commit a crime, and the intent that the crime be completed. United States v. Escobar de Jesús, 187 F.3d 148, 175 (1st Cir. 1999).  "A sustainable conspiracy conviction requires direct or circumstantial evidence which establishes beyond a reasonable doubt that the defendant and one or more coconspirators intended to agree and . . . to commit the substantive criminal offense which was the

---

[8]  18 U.S.C. § 371 reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

-12-

object of their unlawful agreement." <u>United States</u> v. <u>Tejeda</u>, 974 F.2d 210, 212 (1st Cir. 1992) (internal quotation marks omitted). "The prosecution need only show knowledge of the basic agreement, with an intent to commit the underlying substantive offense. The requisite knowledge and intent can be proven through circumstantial evidence, including inferences from acts committed by the defendant that furthered the conspiracy's purposes." <u>United States</u> v. <u>García-Pastrana</u>, 584 F.3d 351, 377 (1st Cir. 2009) (internal quotation marks and alterations omitted). Defendants argue that the government presented no evidence of an agreement or specific plan to carjack the victim, and thus cannot maintain a conspiracy conviction. We do not agree.

The evidence presented at trial shows a well-orchestrated plot to carjack and kidnap the victim, which bespeaks a prior agreement. First, there was testimony that Alberto and Gabriel lived two houses away from Pérez, a fact that would allow the jury to reasonably infer that they were aware of Pérez's dealings and movements. There was also testimony that the last place Pérez stopped his car before the carjacking was a pharmacy on a secluded country road with lots of surrounding cover and vegetation. Moreover, the carjacking occurred on a bolita day, when one familiar with Pérez's dealings could infer that he was likely to have significant amounts of cash in the car. Finally, the presence of the revolver and the handcuffs used to subdue Pérez could also

-13-

reasonably lead to an inference of defendants' forethought in executing their heist. See United States v. Pérez-González, 445 F.3d 39, 49 (1st Cir. 2006) (holding that jury could reasonably infer existence of conspiracy to break into and vandalize a naval base when defendants brought sledgehammers and wire cutters to nearby celebration and acted in a coordinated fashion). Therefore, since the carjacking seems to have been perpetrated at a specifically opportune time, in a conveniently secluded place, using the tools necessary to pull off the operation, a reasonable jury would have legally sufficient evidence to find that defendants Alberto and Gabriel planned the crime in advance and possessed the requisite intent to support a conviction for conspiracy.

### 2. Carjacking[9]

The elements of a carjacking resulting in death are (1) taking or attempted taking from the person or presence of another; (2) a motor vehicle transported, shipped, or received in interstate or foreign commerce; (3) through the use of force, violence, or by intimidation; (4) with the intent to cause death or serious bodily harm; (5) that results in death. See 18 U.S.C. § 2119(3); United

---

[9] Alberto also argues in his brief that the government did not prove all of the elements of the firearms charge beyond a reasonable doubt. See 18 U.S.C. § 924(c)(1)(A)(ii). Because there has been lack of even minimal briefing on appeal, we find that this argument has been waived for lack of appropriate argumentation. See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation.").

-14-

States v. García-Álvarez, 541 F.3d 8, 16 (1st Cir. 2008). Defendants argue that the government also failed to show any of these elements, save the second, beyond a reasonable doubt. Again, we disagree.

To take a motor vehicle from the person or presence of another requires, "at a minimum, proximity to the vehicle and the ability to influence the space encompassing the vehicle . . . ." United States v. Savarese, 385 F.3d 15, 19 (1st Cir. 2004). "In the carjacking context, courts have required the victim to have both a degree of physical proximity to the vehicle and an ability to control or immediately obtain access to the vehicle." Id. at 20 (emphasis omitted). This is not to say, however, that the government must prove that the victim was inside of the vehicle. In Savarese, we recognized with approval that "other circuits have held that the presence requirement of the carjacking statute was satisfied when the victim or victims were inside a building and the stolen vehicle was parked outside the building." Id. Defendants contend that there is no evidence on the record that shows they took the car from the person or presence of Pérez. José's testimony that Alberto characterized the taking as having been accomplished "policeman style," defendants argue, was not sufficient, as it required the jury to guess the phrase's meaning without further development by the government. However, since there was evidence presented showing that Pérez had been driving

-15-

his usual bolita route in the morning and that later in the afternoon the car was driven in an unusual manner by a person other than Pérez, the jury was entitled to conclude that defendants abducted Pérez while he was driving his bolita route. Given this evidence as well as the testimony that Pérez was transported in his vehicle to José's house, a reasonable jury could have also concluded that Pérez was either in his car at the time of the carjacking or sufficiently nearby. In either case, the government met its burden of proof beyond a reasonable doubt as to this element of § 2119(3).

The second element of the statute, requiring that the vehicle to be taken "by force and violence or by intimidation," does not present as great an evidentiary barrier. 18 U.S.C. § 2119. Indeed, the Supreme Court has indicated that an "empty threat, or intimidating bluff" is enough. Holloway v. United States, 526 U.S. 1, 11 (1999). In arguing that the government presented insufficient proof of this element, defendants argue along similar lines as above -- namely, that testimony that the car was obtained "policeman style" is too vague to support a jury finding on the matter. We disagree.

José explained that he understood the phrase "policeman style" to mean that "they stopped the car . . . with the weapon, and they said, this is the police." This was a reasonable interpretation of the phrase which the jury was entitled to credit.

Having further evidence of the presence of a handgun from José's testimony, the jury could have reasonably concluded that the carjacking was performed at gunpoint. Finally, there was also evidence presented that Pérez was forcibly restrained during the incident, given the fact that he was handcuffed in the back seat of his own vehicle. A jury was entitled to conclude that Pérez was abducted through the "use of force, violence, or intimidation."

The last disputed element of the carjacking offense is the intent element, which requires that a vehicle be taken with "intent to cause death or serious bodily harm." 18 U.S.C. § 2119. It is well-settled that the statute does not refer to a carjacking which merely happens to result in death. United States v. Matos-Quiñones, 456 F.3d 14, 17 (1st Cir. 2006) ("[T]his statute is not a felony murder analog. Even if death results, the statute requires intent to cause death or serious bodily harm.") (internal quotation marks omitted). Rather, the statute requires that the defendant possessed either actual or conditional intent to cause death or serious bodily harm to the carjacking victim. In Holloway, the Supreme Court explained that "[t]he intent requirement of sec. 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car)." 526 U.S. at 12.

Even if the defendant did not intend to kill the driver, the intent element is satisfied if the defendant was willing to kill the driver to effect the theft of the car.  The parenthetical at the end of the quotation implies that the Court saw a distinction between killing for its own sake and willingness to kill to effect the theft, and that it deemed both circumstances as meeting the intent standard of § 2119.

This actual or conditional intent must be formed "at the moment the defendant demanded or took control over the driver's automobile . . . ."  Id.;  see also United States v. Evans-García, 322 F.3d 110, 114 (1st Cir. 2003);  United States v. Rosario-Díaz, 202 F.3d 54, 63 (1st Cir. 2000) ("[T]he mental state required by the statute . . . is measured at the moment that the defendant demands or takes control of the vehicle.").

Defendants argue that the government presented no evidence to show that they had formed either an actual or conditional intent to kill or seriously injure Pérez at the moment the carjacking occurred.  The only evidence on this point, they contend, points to precisely the opposite conclusion -- that defendants meant to rob Pérez and ended up killing him after the carjacking, when he became difficult.[10]

---

[10]   José testified that Gabriel told him, "We had to kill him because it got real difficult for us and he struggled a lot."

-18-

We considered very similar facts in Matos-Quiñones. In that case, the defendants took the victim's car keys and forced him, at gunpoint, to lie down in the rear of the vehicle, while they drove away.[11] Later, after discovering that the victim was a sailor, defendants decided to kill him. Matos-Quiñones, 456 F.3d at 16. They stopped in a secluded area, then, after a struggle prompted by an escape attempt, defendants shot the victim in the back of the head, killing him. Id. at 16-17. Thus, in Matos-Quiñones, we were faced with a situation in which a carjacker stole a car, held the owner hostage, and later killed him. These circumstances raised the question of whether the moment of the carjacking, at which point the actual or conditional intent must manifest, could be extended from the initial taking to a later period in time by virtue of holding the victim hostage. We did not decide this issue in Matos-Quiñones, however, because the defendants pleaded guilty. Likewise, we do not see the need to decide it presently, as we believe that in this case a reasonable jury had enough evidence to conclude that defendants possessed either actual or conditional intent to cause the death of Pérez, or to inflict upon him serious bodily harm, at the moment they took his vehicle.

---

[11] This seems to correlate with the "policeman style" abduction method used by Alberto and Gabriel.

The evidence on the record, taken as a whole, supports the inference that defendants intended or were willing to seriously injure or kill Pérez when they committed the carjacking. For one, there was evidence presented that defendants used a handgun to abduct Pérez. It is true that this fact alone would not support a finding of actual or conditional intent. See Holloway, 526 U.S. at 11-12 n.13 ("[W]e have found no case of a conviction of assault with intent to kill or murder, upon proof only of the levelling of a gun or pistol.") (internal quotations omitted). That is not, however, the full extent of the evidence presented to the jury on this issue. There was also testimony that could lead a reasonable jury to conclude that Alberto and Gabriel abducted Pérez while he was in his own vehicle. Additionally, there was testimony that Pérez was restrained with handcuffs when he arrived at José's house. Finally, Pérez's cries for help during his attempted escape[12] lead to the inference that he felt his life was threatened. This conclusion is reasonable, given defendants' displays of violence during the ordeal, and their ultimate act of asphyxiating Pérez.[13] Taken in conjunction, and viewing ambiguities in the light

---

[12] José's neighbor Ramos heard Pérez shout "Help, they want to kill me," as he struggled to escape.

[13] We do not believe, and, as discussed above, our prior cases do not support, that the act of killing alone satisfies the intent element of § 2119. Common sense, however, dictates that the final act, at the very least, evidences the intent. Cf. United States v. Lebrón-Cepeda, 324 F.3d 52, 64 (1st Cir. 2003) (per curiam) (Howard, J., concurring) ("In my view, we could have affirmed

most favorable to the verdict, this evidence could plausibly lead a reasonable jury to conclude that Alberto and Gabriel were at least willing to seriously injure, if not kill Pérez, at the moment of the carjacking given the evidence that defendants used a revolver, put Pérez in handcuffs, and placed him in his own car, were willing to and did use violence to prevent his escape, and then did actually kill him after an extended period of holding him hostage.  Cf. United States v. Lebrón-Cepeda, 324 F.3d 52, 57 (1st Cir. 2003) (per curiam) (holding that conditional intent to kill could be inferred from fact that defendant placed a gun against the victim's head and threatened him, even though the actual killing occurred at a later time).  We therefore hold that sufficient evidence was presented to allow a reasonable jury to find that the government satisfied its burden of proving the intent element of § 2119(3).

### B.  Admission of Alberto's Statements

Gabriel appeals the district court's decision to allow introduction of Alberto's recorded statements from his telephone call with his mother.  Admission of this evidence, he argues, violated his rights under the Confrontation Clause of the Sixth Amendment, as outlined by the Supreme Court precedents of Crawford

---

[defendant's] conviction simply because he intentionally shot [the victim] in the head at close range during the actus reus, thus manifesting an intention to seriously harm or kill him.").

-21-

v. <u>Washington</u>, 541 U.S. 36 (2004), and <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968).

Gabriel did not properly preserve his <u>Crawford</u> objection, so our review is for plain error only.  <u>See</u> <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001).  Since Gabriel did preserve his <u>Bruton</u> objection at trial, we review the district court's determination under <u>Bruton</u> <u>de novo</u>.  <u>United States</u> v. <u>Vega-Molina</u>, 407 F.3d 511, 519 (1st Cir. 2005).

The Supreme Court's decision in <u>Crawford</u> stands for the proposition that "the Confrontation Clause bars admission of testimonial hearsay in a criminal case unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination." <u>United States</u> v. <u>Earle</u>, 488 F.3d 537, 542 (1st Cir. 2007) (citing <u>Crawford</u>, 541 U.S. at 68).  The parties agree that Alberto was unavailable for cross-examination, as he invoked his right not to testify.  Thus, admissibility of Alberto's conversation would violate defendant Gabriel's Confrontation Clause rights unless the statements were either non-testimonial or not hearsay.  Since Gabriel does not challenge whether or not Alberto's statements were hearsay, we turn to the question of whether they were testimonial.[14]

---

[14] Gabriel does not challenge whether or not Alberto's statements were hearsay.  Prior to the Supreme Court ruling in <u>Davis</u> v. <u>Washington</u>, 547 U.S. 813 (2006), courts employed an additional line of Confrontation Clause analysis for non-testimonial hearsay.  <u>See</u> <u>Horton</u> v. <u>Allen</u>, 370 F.3d 75, 84 (1st Cir. 2004) ("<u>Crawford</u> draws

The Supreme Court provides the following examples to guide a court's determination of whether an out-of-court statement is testimonial:  Testimonial statements take the form of 1) "ex parte in-court testimony or its functional equivalent;" 2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and 3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51-52 (internal quotation marks omitted). Furthermore, this Circuit has stated that, in determining whether a statement is testimonial, a court should consider whether "an objectively reasonable person in [the declarant's] shoes would understand that the statement would be used in prosecuting [the

_____

a distinction between testimonial and non-testimonial hearsay and applies only to the former category of statements.").  Thus, when it was handed down, Crawford did not change the test for non-testimonial hearsay, which could only be admitted based on a "'firmly rooted hearsay exception' or [if it bore] 'particularized guarantees of trustworthiness.'" Crawford, 541 U.S. at 60 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).  In other words, until Davis, Roberts remained the controlling precedent for judging whether non-testimonial hearsay violated the Confrontation Clause. After Davis, however, non-testimonial hearsay no longer implicates the Confrontation Clause at all.  See Earle, 488 F.3d at 542; see also United States v. Rodríguez-Berríos, 573 F.3d 55, 61 n.4 (1st Cir. 2009).  So, a finding that Alberto's conversation was non-testimonial should end the matter, and there is no need to determine whether or not the non-testimonial hearsay qualifies as a firmly rooted exception or if it bears the particularized guarantees of trustworthiness.

defendant] at trial." United States v. Maher, 454 F.3d 13, 21 (1st Cir. 2006).

Gabriel notes that Alberto was repeatedly warned that his telephone conversations were recorded. Furthermore, he was actually aware of this fact, and even stated in that conversation that he could not say much over the telephone. Thus, Gabriel argues, a reasonable person in Alberto's shoes would know that the conversation was being recorded, and would thus expect that anything he said could be used to prosecute him, making the statements testimonial pursuant to Maher. See id. We believe that Gabriel's analysis misses the mark, and that Alberto's statements were not made under circumstances that render them testimonial.

Looking at the examples given by the Supreme Court in Crawford, it is plain that Alberto's statements to his mother were not "solemn declarations made to government officials in circumstances that resemble the repudiated civil-law mode of interrogation," and thus cannot be treated as testimonial. United States v. Brito, 427 F.3d 53, 68 (1st Cir. 2005) (Howard, J., concurring) (quoting Crawford, 541 U.S. at 51). He did not make the statements to a police officer, during the course of an interrogation, or in a structured setting designed to elicit responses that intended to be used to prosecute him. Rather, Alberto had a conversation with a close family member without any intention of assisting in his own prosecution -- in fact, quite the

opposite.  Other courts have found accordingly in similar circumstances.  See, e.g., United States v. Manfre, 368 F.3d 832, 838 n.1 (8th Cir. 2004) ("[Declarant's] comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which Crawford speaks."); Saechao v. Oregon, 249 F. App'x 678 (9th Cir. 2007) (unpublished opinion) (holding that jailhouse conversation over the phone with an acquaintance was not testimonial, as declarant did not have the purpose of supplying prosecution with evidence).

Gabriel also challenges the admitted statements under Bruton.  In Bruton, the Supreme Court held that, in a joint trial, a non-testifying defendant's confession that was "powerfully incriminating" against a co-defendant could not be admitted, as any limiting instruction would be inadequate to relieve the Confrontation Clause problems.  391 U.S. at 135; Furr v. Brady, 440 F.3d 34, 37 (1st Cir. 2006).  However, as the companion opinion explains, the Bruton rule does not apply to non-testimonial hearsay statements.  See Figueroa Cartagena, No. 08-2110.  Since we have determined that the recorded conversation was non-testimonial, Bruton is not implicated.

We therefore conclude that the recorded conversation was properly admitted.

-25-

## C. Prosecutor's Statements During Closing Arguments

Defendant Gabriel enumerates a litany of statements made by the prosecutor during her closing arguments that he contends warrant a new trial because they unfairly prejudiced the jury, and were not overcome by instructions from the judge. He also argues that the government's case lacked the strength to overcome the prejudice caused by the prosecutor's individual and combined closing argument errors. Since Gabriel did not object to these statements during trial, our review is for plain error only. United States v. Henderson, 320 F.3d 92, 105 (1st Cir. 2003). "[Plain] error will not be recognized unless it caused a miscarriage of justice or seriously undermined the integrity or public reputation of judicial proceedings." Id. (internal quotation marks omitted). A prosecutor's remarks necessitate reversal of the verdict "only if they so poisoned the well that the trial's outcome was likely affected." Id. at 107 (internal quotation marks omitted).

"Even if the remarks are improper, we affirm unless they prejudiced the defendant." United States v. García-Pastrana, 584 F.3d 351, 389 (1st Cir. 2009). We look to the following factors in considering prejudice: "(1) the severity of the prosecutory's misconduct, including whether it was deliberate or accidental;" (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such

-26-

instructions; and (4) the strength of the evidence against the defendants." Id. (quoting United States v. Nelson-Rodríquez, 319 F.3d 12, 38 (1st Cir. 2003).

First, Gabriel challenges two of the prosecutor's statements which he contends reflected the prosecutor's own opinions regarding her witness's credibility. We have held that "[a] prosecutor improperly vouches for a witness when she . . . impart[s] her personal belief in a witness's veracity or impli[es] that the jury should credit the prosecution's evidence simply because the government can be trusted." United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003); United States v. Flores-De-Jesús, 569 F.3d 8, 18 (1st Cir. 2009).

Gabriel's challenge under this rubric is to the statement made by the prosecutor that "José Figueroa-Cartagena comes into court and tells you under oath." We dispose of this challenge easily, as the statements that José testified under oath merely stated a fact and were neither a personal assurance, nor invoked the prestige of the government. See Pérez-Ruiz, 353 F.3d at 10 (finding no improper vouching since prosecutor "neither expressed her personal opinion regarding the veracity of any witness nor implied that [the witness] should be trusted because of some connection to the government"). We thus do not believe the district court committed plain error in allowing the jury to hear this statement.

-27-

The next statements that Gabriel challenges referred to another of the prosecutor's witnesses and the victim's wife, Rosario. Gabriel quotes statements made by the prosecutor at closing argument and alleges that they impermissibly bolstered Rosario's credibility. We reproduce the challenged portion of the closing argument below.[15]

> And she made a mistake referencing the photo spreads, because she had two photo spreads before her at the time.
> But she clarified that, and <u>I think her testimony was very clear that when she wrote these words, she's referring to the photograph of Félix Gabriel Castro-Davis.</u> "It looks familiar to me. To me, it is a young man who entered my house. I'm not sure, but the young man at that time was thinner. I've seen this kid in barrio San Antonio in Caguas."
> Compare that photograph of Félix Gabriel Castro-Davis to the photograph of Félix Gabriel Castro-Davis on August 10, 2006. What would that be? Like two to three -- three to four weeks later. Here is Félix Gabriel on the photo spread that [Rosario] saw, and here is the photograph of Félix Gabriel on August 10th, 2006.
> <u>It seems to me, and I submit to you, that [Rosario] is right on the money. Same guy, just thinner.</u>

We agree with Gabriel that the prosecutor's statements went too far in this case. The phrases "I think" and "it seems to me," and the statement that the government witness was "right on the money" were improper. <u>But see</u> <u>Henderson</u>, 320 F.3d at 106 (noting that "although it is the jury's job to draw the inferences, there is

_____

[15] Gabriel only challenged the italicized portions.

-28-

nothing improper in the Government's suggesting which inferences should be drawn") (quoting United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990). Nevertheless, given the weight of the evidence against Gabriel, we find that these statements were not sufficiently prejudicial as to constitute reversible error.

Gabriel also challenges the following statement made by the prosecutor at closing: "What an incredible, terrible coincidence for the defendant, that [Rosario's] physical description of him fits him perfectly." Rosario testified that the first intruder in her home was tall and skinny and stated that a photograph of Gabriel "looked a lot like that individual" who broke into her home, though she could not certainly state it was the intruder. There is no evidence on the record as to Gabriel's appearance from which to conclude whether "tall and skinny" fits well as a description of defendant. However, we do not find this statement to be significantly prejudicial given Rosario's testimony that Gabriel's photo "looked a lot like that individual" who invaded her home.

Gabriel next argues that the prosecutor's statement that José did not know the victim was a bolitero until defendants told him so improperly commented on the character of José by implying that he was not aware of the victim's illegal activities, as he was of good character and was not familiar with the criminal world. As

above, we do not believe this is the sort of credibility bolstering that amounts to plain error and would warrant a new trial.

Gabriel also challenges a statement by the prosecutor that Pérez "knew the streets. This is not the first time he encountered people like [Alberto] and [Gabriel]." Gabriel alleges that this statement portrayed the defendants as criminals and implied they were involved in illegal gambling. While we will not condone prosecutor statements that malign the character of defendants, without evidentiary support or in ways not related to the charges, we do not believe that this statement "so poisoned the well" that a new trial is required. This statement was also arguably accurate. There was testimony presented at trial that Pérez once lived two houses away from Gabriel and Alberto, and therefore literally knew each other from the streets. José also testified that the day after the murder, Gabriel told him that Pérez was a numbers runner.

Gabriel also argues that the prosecutor's statement that "José . . . said to you that he saw Félix Gabriel Castro-Davis carrying a revolver" was improper, because José only testified that he "noticed that [Alberto] had pulled out a weapon and placed it on top of the car on the right side." While it was improper for the prosecutor to confuse Félix Alberto Castro-Davis with Félix Gabriel Castro-Davis, we do not think this lone statement amounted to clear error.

-30-

Gabriel contends that the next error occurred when the prosecutor stated that there was "not a single shred of evidence" and "not a single reason" that José would lie, and also stated that defendants did not attempt to cross-examine José. This statement was not improper. The prosecutor was commenting on the lack of impeachment evidence against José, not giving his opinion as to José's credibility.

Gabriel finally challenges the prosecutor's last statement to the jury: "And you hold them accountable for what they did, all three of them. You hold them accountable." We agree with the government that this amounts to a request from the prosecutor to render a guilty verdict. The government points us to United States v. Flaherty, where we stated that "[t]he prosecutor's statement that the Government would ask the jury to return guilty verdicts does not bring the Government's credibility to bear on the case." 668 F.2d 566, 597 (1st Cir. 1981). However, after Flaherty, the Supreme Court decided United States v. Young, and held that a prosecutor was "in error to try to exhort the jury to 'do its job' [because] that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." 470 U.S. 1, 18 (1985); see also United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) ("There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only

distract a jury from its actual duty: impartiality."). We thus find that this statement was improper. However, given the weight of the evidence presented against Gabriel and the brevity of the statement, we find that it was not sufficiently prejudicial as to warrant a new trial.

Even though some of the prosecutor's remarks were improper, we do not think they so poisoned the well as to require a new trial. United States v. Vázquez-Botet, 532 F.3d 37, 56 (1st Cir. 2008). We take note, and register our concern, with the fact that there was no contemporaneous objection or request for curative instructions, thus depriving the district judge of the opportunity to provide special or additional instructions with regards to the closing statements, and consequently, failing to provide defendants of the type of diligent defense to which they are entitled. However, the court's general closing instructions did properly counsel the jury regarding what constituted evidence and the fact that they were the sole judges of credibility. The instructions specifically reminded jurors they were the "sole judges of the credibility of the witnesses" and that "arguments and statements of counsel are not evidence." Given the evidence presented at trial from multiple witnesses, any potentially harmful effect from the prosecutor's closing was safeguarded by the district court's final jury instructions. See United States v. Mejía-Lozano, 829 F.2d

268, 274 (1st Cir. 1987) (finding that the district judge's standard instruction was sufficient to overcome any prejudice).

### D. Sentencing Errors

Alberto and Gabriel argue that the district court erred when it sentenced them to a mandatory term of life imprisonment for a murder that they were neither charged with nor convicted of committing and seek that their sentence be vacated and remanded.[16] Because both Alberto and Gabriel failed to object during the sentencing hearing to the district court's misstatement regarding the statutory sentence for carjacking, our review is for plain error.  United States v. González-Castillo, 562 F.3d 80, 82 (1st Cir. 2009).  Under plain error review, for this Court to correct an error not objected to in the district court, "there must be an 'error' that is 'plain' and that 'affects substantial rights.'" United States v. Olano, 507 U.S. 725, 732 (1993) (alteration omitted).  If those three factors are all met, this Court has discretion to correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings."

---

[16]  Gabriel failed to make this argument in his brief, which would normally mean it would be waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  On October 28, 2009, after oral argument had concluded, Gabriel filed a motion with this court requesting to join and adopt Alberto's argument that the district court erred in sentencing the defendant to a mandatory life term for murder where he was convicted of a carjacking resulting in death.  Because we find that Alberto and Gabriel are in the same legal and factual position, and that the interests of justice compel it, we grant Gabriel's motion.

Id. at 736 (internal quotation marks and alterations omitted). We find that all four requirements are met in this case.

The government concedes that the district court committed plain error during the sentencing hearing and agrees that this error warrants vacating Alberto's -- and by adoption, Gabriel's -- sentence and remanding the case to the district court for resentencing. The district court referred to the defendants' crime of conviction as "first degree murder in the context of carjacking." The district court compounded its mistake by also stating on more than one occasion that the statutory penalty for the crime was life imprisonment. This was incorrect since the statutory penalty for carjacking resulting in death is "any number of years up to life." 18 U.S.C. § 2119(3).

Defendants also argue, and the government does not dispute, that this error affected their substantial rights. It appears that because the district court thought that the statutory sentence was life imprisonment, it felt bound to impose a life sentence. We agree that this affected the outcome of the proceedings below, and additionally, that the district court's error threatened to compromise the fairness, integrity, and public reputation of the proceedings. We thus hold that Alberto and Gabriel's sentence should be vacated and remanded for resentencing.

## III. Conclusion

For the reasons discussed, we <u>affirm</u> the judgment against Félix Alberto Castro-Davis and Félix Gabriel Castro-Davis's but <u>reverse and remand</u> their sentences.

**<u>Affirmed, Reversed and Remanded</u>**.