# United States Court of Appeals
## For the First Circuit

No. 09-1201

UNITED STATES OF AMERICA,

Appellee,

v.

ARTHUR MICHAEL KINSELLA,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Lipez, Howard, and Thompson,
Circuit Judges.

Tina Schneider for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Paula D. Silsby, United States Attorney, was on brief, for
appellee.

October 14, 2010

**THOMPSON**, <u>Circuit Judge</u>.  Using standard investigative techniques – including informants, controlled drug buys, and tape-recorded conversations – law enforcement agents uncovered an OxyContin-selling conspiracy centered in Maine.  A morphine-like narcotic, OxyContin is an oxycodone-based product often prescribed to treat chronic pain.  Putting the operation out of business, agents arrested Arthur Michael Kinsella, a Canadian-based dealer who had smuggled OxyContin into Maine.  Later released on bail, Kinsella skipped a re-arraignment hearing and so became a fugitive from justice.  Shipped back to Maine by Canadian authorities, Kinsella faced charges of conspiring to possess and distribute oxycodone, possessing oxycodone with intent to distribute, and willfully failing to appear in court as required.  <u>See</u> 21 U.S.C. §§ 846 and 841(a)(1), and 18 U.S.C. § 3146(a)(1).

Acting on Kinsella's motion, Judge (now Chief Judge) Woodcock severed the oxycodone counts from the bail-jumping count for trial purposes.  After separate juries convicted Kinsella across the board, Judge Woodcock sentenced him to 97 months in prison and 36 months of supervised release.  Kinsella now challenges his convictions and sentence on several fronts.  For openers he argues that multiple instances of prosecutorial misconduct deprived him of his fair-trial rights.  The first incident revolves around the prosecutor's unobjected-to questioning of a cooperating witness, Christopher Hitchcock.  Caught pushing OxyContin for Kinsella,

-2-

Hitchcock cut a deal with the government, concluded his case on favorable terms – Judge Woodcock sentenced him to 24 months, well short of the 20-year statutory maximum – and testified against Kinsella at the drug trial. Kinsella's lawyer aggressively confronted Hitchcock on cross-examination, using the plea agreement and light sentence to attack his credibility. During the government's redirect, however, Hitchcock revealed that Judge Woodcock had sentenced him. Speculating that jurors hearing this must have concluded that Judge Woodcock had already found Hitchcock credible – why else would he have imposed such a "lenient" sentence? – Kinsella insists that justice demands that he get a new trial on the drug counts. He also asserts that certain unobjected-to comments by prosecutors during closing arguments warrant reversal on plain-error review. Turning to sentencing, Kinsella contends that Judge Woodcock erred in his drug-quantity calculation. After a studied review of the briefs and the record, we affirm Kinsella's convictions and sentence.

## BACKGROUND

We present the facts in the light most favorable to the guilty verdicts, consistent with record support. See, e.g., United States v. Bunchan, 580 F.3d 66, 67 (1st Cir. 2009).

### How the Charges Arose

### <u>The OxyContin conspiracy</u>

In December 2003, agents with the federal Drug Enforcement Administration (DEA) heard that Gregory Panther was selling Canadian-made OxyContin pills in Maine. Hoping to work their way up the drug-distribution ladder, agents had an informant make a controlled buy from Panther in March 2004. Panther's actions led to his arrest in June 2004 – an arrest that also netted Panther's dealer, Richard Hopkins.

Deciding to cooperate, Hopkins identified Christopher Hitchcock as his supplier and said Hitchcock had a Canadian supplier. At the agent's request, Hopkins made a series of recorded calls to Hitchcock in the fall of 2004. Speaking in code, Hopkins asked Hitchcock for all the OxyContin that he could get. Hitchcock tracked down Kinsella, got 90 OxyContin pills, and sold them to Hopkins in December 2004. Each pill had a "CDN" stamp on one side (indicating that it had been manufactured in Canada) and an "80" mark on the other (suggesting that it was an 80-milligram tablet).

His interest piqued, Fred Luce, a DEA task-force member, then subpoenaed Hitchcock's phone records. Perusing the papers, Luce noticed a lot of calls on the day of the controlled buy between Hitchcock and Kinsella, often following calls between Hopkins and Hitchcock. Hopkins later asked Hitchcock for more pills, and Hitchcock called Kinsella to score some more. The deal never

happened, however, because agents arrested Hitchcock in February 2005.

Seeing the writing on the wall, Hitchcock agreed to help the government arrest and convict Kinsella. Hitchcock had known Kinsella for years. They both frequented a Bangor, Maine racetrack, and they trusted each other. Hitchcock had even bailed Kinsella out of a previous scrape with the law.

For a year to a year and a half before his February 2005 arrest, Hitchcock served as a go-between for Kinsella and Hopkins. Every 3-6 weeks, Hitchcock got 90-180 pills from Kinsella (his sole supplier) and sold them to Hopkins (his sole customer) at around $34 a pill. Conceding that he had trouble remembering exact dates, Hitchcock said that sometimes more than 6 weeks passed between transactions, and that one time Kinsella handed him 270-300 pills to sell. Turning the drug money over to Kinsella, Hitchcock occasionally got $100-$200 and a free meal for his work.

With Hitchcock on board, DEA agents contacted the Royal Canadian Mounted Police to see what information they had on Kinsella. Getting his Canadian license plate number, agents pieced together that Kinsella's minivan had crossed the border into Maine a couple of hours before the December 2004 Hitchcock-Hopkins drug deal. Phone records revealed that Kinsella and Hitchcock had called each other right around the time the deal transpired. That is not surprising – they called each other a lot, 79 times, in fact,

between July 2004 (right around the time Hopkins fingered Hitchcock as his supplier) and February 2005 (when agents arrested Hitchcock). Agents had Hitchcock call Kinsella over the next month or so to set up another deal. During these recorded conversations, the two used code words. "Birthday party" meant drug deal. "More people" meant more pills. "How much a dinner plate?" meant how much per pill.

Looking to do another deal in March 2005, Kinsella asked Hitchcock on tape whether it was "cool or what." "Yeah," Hitchcock said, "should be no problem." "I assume there's going to be 90 or 100 at most," Kinsella said later. "We got to go to 34, though," he added. Hitchcock and Agent Luce knew what Kinsella was doing: he was confirming that he would hand Hitchcock 90-100 OxyContin pills to sell at a price of $34 per pill. Convinced that they had a meeting of the minds, Kinsella told Hitchcock that they should meet up at a Bangor Burger King at 8 p.m. on March 19.

Armed with this information, the DEA asked local police to help nab Kinsella before he got to the Burger King. At about 7:45 p.m. on March 19, a police officer spotted Kinsella's minivan, saw him tailgating another vehicle, and pulled him over. Admitting to the moving violation, Kinsella told the officer he had come from Canada to pick his sister up at the Bangor airport. In fact, his sister had left Maine and flown back home some 14 hours earlier. Kinsella also said that he had no illegal drugs and was not taking any prescription medicines. A consented-to search of his minivan,

however, turned up a leather organizer tucked in between the front seats. Finding a prescription bottle in Kinsella's name inside, the officer counted 100 green pills, each marked "CDN" on one side and "80" on the other. Doing an about-face, Kinsella now said that the pills were his. He also handed over his cell phone, which had Hitchcock's number saved in the address book.

Arrested and booked that night, Kinsella wound up in jail. Calling his mother, Kinsella asked her to give Hitchcock's phone number to his brother, Rick Kinsella. "[T]ell Rick" to "tell [Hitchcock] what happened," Kinsella said. Kinsella apparently wanted Hitchcock to bail him out. Calling Rick the next day, Kinsella heard that no one had gotten in touch with Hitchcock. "[D]on't call him no more," Kinsella told Rick. "[H]e wouldn't have the money to bail me out anyway." Kinsella's jailers recorded each call.

A magistrate judge eventually released Kinsella on personal recognizance in April 2005. The release order forbade Kinsella from leaving Maine, required him to report to a pretrial services officer (PSO), and commanded him to appear at scheduled proceedings. The order also alerted him to the penalties he might incur if he violated these terms. Driving all this home at a meeting three days later, PSO Wade Maddox gave Kinsella a business card with contact information and told him to check in with probation every week.

That same month, a federal grand jury indicted Kinsella on two counts. Count 1 charged that Kinsella conspired to possess and distribute oxycodone-based substances from January 2003 to June 2004. See 21 U.S.C. §§ 841(a)(1) and 846. Count 2 alleged that Kinsella possessed with intent to distribute oxycodone-based substances on March 19, 2005 – the date of his arrest. See 21 U.S.C. § 841(a)(1). Kinsella pleaded not guilty at his arraignment.

### The bail-jumping

Claiming that he needed to return to Canada for medical treatment, Kinsella asked the magistrate judge in May 2005 to modify his release conditions so he could live there. He promised that he would not miss any court hearings. Releasing him on $5,000 bail, the magistrate judge still required Kinsella to appear at scheduled proceedings and to stay in touch with the PSO. Kinsella promised he would but did not keep his word: after the grand jury returned a superseding indictment extending the conspiratorial period to December 2004, Kinsella stopped calling probation (though PSO Maddox did not turn him in) and missed a scheduled re-arraignment. Kinsella had known about the re-arraignment date – August 2, 2005, his lawyer, Matthew Erickson, had told him, stressing that Kinsella had to be there – but Kinsella stayed in Canada anyway.

Declaring him a fugitive from justice, the magistrate judge signed a warrant for Kinsella's arrest. Erickson called Kinsella that day and learned that Kinsella had made no effort to

cross the border into the United States.  Mentioning the arrest warrant, Erickson told Kinsella that an indictment for failing to appear would no doubt follow – and it did, three months later. Apparently unmoved by all this, Kinsella chose not to turn himself in.

Canadian authorities placed Kinsella in custody in October 2006.  Challenging his extradition under that country's laws, Kinsella lost an appeal and returned to the United States in September 2007, in cuffs and escorted by Mounties.  Facing a superseding indictment that added a bail-jumping count to the old drug charges, Kinsella asked Judge Woodcock to sever the drug counts from the bail-jumping count for trial.  Granting the motion, Judge Woodcock ordered a trial on the bail-jumping count first, followed by a trial on the drug charges.

**How the Trials Unfolded**

**<u>The bail-jumping trial</u>**

Thanks to some pretrial stipulations, the only issue at play during the two-day bail-jumping trial was whether Kinsella had <u>willfully</u> failed to appear at the re-arraignment – and there was enough for the jury to find beyond a reasonable doubt that he had. Kinsella's repeated open-court pledges to return for scheduled proceedings practically leapt from the pages of the bail-hearing transcripts, which the lawyers had stipulated into evidence.  The jury also heard from PSO Maddox, who testified about discussing the

release conditions with Kinsella, handing him a card with a toll-free number to use in checking in with probation, and hearing nothing from him leading up to and following his no-show at the scheduled re-arraignment. Attorney Erickson testified about notifying Kinsella of the date and time of the re-arraignment, reminding him he had to be there, giving him a heads-up on the arrest warrant and the failure-to-appear charge after his no-show, and hearing how he had made no effort to cross the U.S. border to make the re-arraignment and was bent on fighting extradition. Cinching matters, a deputy U.S. Marshal testified about how the Mounties hauled a hand-cuffed Kinsella back to the United States two years after he had skipped the re-arraignment.

Ultimately, though, Kinsella does not contest the sufficiency of the evidence against him. Instead he attacks the prosecutor's closing argument, which, he says, represented an improper appeal to the jurors' emotions. After Judge Woodcock instructed the jury that the government had the burden of proving guilt beyond a reasonable doubt and that closing arguments are not evidence, the prosecutor began his summation with this statement:

> This case is important because we all can appreciate the need for defendants who are charged with crimes to appear in court. Our courts have a very important function in the United States, and they cannot carry out their responsibilities if defendants in criminal cases are allowed to ignore the promises that they make to judges, to disobey court orders, and to fail to appear in violation of the law.

Defense counsel did not object.  Building to a crescendo, the prosecutor later stressed that a person who shows up to a hearing "two hours" or even "two days late" may "not be willful," but a person who fails to call his PSO, who fails to self-surrender, who fights extradition and then only returns in cuffs two-plus years after his no-show "has willfully failed to appear in court."  The jury must have agreed – it found Kinsella guilty after deliberating for about 38 minutes.

### The drug trial

A four-day trial on the drug charges followed, and the evidence against Kinsella was strong:  phone records, recorded calls, and testimony from Hitchcock, Agent Luce, and the arresting officer helped nail down his guilt.  Kinsella does not contend that the evidence could not support conviction.  Instead his trial-error claims target the prosecutor's questioning of Hitchcock and the prosecutor's closing argument, so we highlight here only those facts needed to put these issues into proper perspective.

Throughout the trial, defense counsel never missed an opportunity to paint Hitchcock as a plea-bargained witness who had set Kinsella up to avoid a 20-year sentence.  Hitchcock needed someone – anyone – so he would not be "left holding the bag," Kinsella's lawyer said in her opening statement.  Pulling no punches, defense counsel asked Hitchcock on cross-examination whether he had "cooperated with the government" so he "wouldn't have

to do as much time." "Yes," Hitchcock said, conceding, too, that he was testifying for the prosecution as part of his plea agreement and that he could have received a 20-year rather than a 2-year sentence had he not cooperated. Hitchcock also admitted that he "would do anything" to get his old life back.

On redirect the prosecutor tried to focus on the sentencing process. Asking Hitchcock to recall defense counsel's questions about the "sentence" and the "cooperation agreement with the government," the prosecutor queried: "Do you remember where you were sentenced, where your sentence took place?" "Right here," Hitchcock said, in "this courthouse." The prosecutor then asked – and this is the allegedly offending question – whether Hitchcock recalled "who" had sentenced him. "Judge Woodcock," Hitchcock replied. "And who decided what your sentence was?" the prosecutor inquired. "The judge," Hitchcock said. Kinsella's lawyer neither objected to the prosecutor's questions nor moved to strike Hitchcock's responses. Instead she confirmed with Kinsella on re-cross that "the judge" had decided his sentence after the government had agreed to ask for "less time."

Before closing arguments, Judge Woodcock cautioned the jurors to consider Hitchcock's testimony with great care. Cooperating witnesses, he said, are not always truth-tellers – they sometimes spin lies about what others have done to save themselves jail time, so the jurors had to consider whether Hitchcock had an

ax to grind against Kinsella or had received any reward for cooperating with the prosecution. Hitchcock's guilty plea was fair game in assessing his credibility, Judge Woodcock said, but the jurors could not consider his plea as evidence against Kinsella "in any way." Judge Woodcock also told them that counsel's arguments are not evidence and that they were the sole triers of fact and determiners of witness credibility.

In closing argument the prosecutor hammered home the evidence against Kinsella – the controlled drug buys, Hitchcock's pinning Kinsella to the crimes, the coded conversations about OxyContin, Kinsella's agreeing to slip Hitchcock 100 or so OxyContin pills on March 19 at a Bangor Burger King, Kinsella's lying to a police officer that evening about having to drive to a Bangor airport to pick up his sister, the officer's seizing 100 pills from him after Kinsella lied about having no pills, etc. Regarding the recorded jailhouse calls, the prosecutor said:

> [Kinsella] knows Chris [Hitchcock]; he knows the number; and he wants someone to call Chris. First and foremost, if [Kinsella] can off-load the Oxy, theoretically, he could get some money if he needed to make bail or anything else of that nature. But he knows Chris; he knows the number; and he provides the same number that's been called all along.

There was, in fact, no evidence that Kinsella had tried to deal OxyContin from jail. But defense counsel did not object. Instead she argued in her closing that sloppy investigative work caused the police to arrest an "innocent man." Hitchcock had told a pack of

-13-

lies to avoid a 20-year sentence, defense counsel said. Hitchcock needed a "patsy" – someone he could roll over on – and Kinsella would do just fine. Not so, the prosecutor said in his rebuttal closing argument. "There's no cheating here, and there's no conspiracy to frame" Kinsella. After about five hours of deliberations, the jury convicted Kinsella on the OxyContin-related counts.

Kinsella filed a timely new-trial motion. See Fed. R. Crim. P. 33(b)(2). His lead argument was that the prosecutor crossed the line by prompting Hitchcock to say that Judge Woodcock had sentenced him – a comment Kinsella insists suggested to the jury that the Judge (who had given Hitchcock a 2-year sentence out of a possible maximum sentence of 20 years) had believed every word Hitchcock said on the stand. Calling Kinsella's claim "odd and elusive," Judge Woodcock ruled that the prosecutor never tried to put a stamp of judicial approval on Hitchcock's testimony and never even intimated that the jury should find one. The prosecutor simply wanted to rehabilitate Hitchcock, Judge Woodcock stressed. Invoking the saying "once burned, twice shy," Judge Woodcock found that this evidence implied that Hitchcock would think twice before perjuring himself "in front of a judge who had already sentenced him to prison." Finding no caselaw to bolster the "fanciful" notion that the prosecutor had "somehow vouched for the judge's knowledge of

[Hitchcock's] credibility," Judge Woodcock denied Kinsella's new-trial motion.

### How the Sentence Worked Out

Acting under the now-advisory federal sentencing guidelines, Judge Woodcock set out to compute the relevant guideline sentencing range. Defense counsel and the prosecutor started sparring over whether each OxyContin pill contained 75 or 80 milligrams of oxycodone. Testing a randomly selected sample of 25 OxyContin tablets taken from Kinsella, a DEA chemist had put the number at 75 milligrams. Believing that that issue might not matter depending on what other findings he made, Judge Woodcock decided to focus first on the length of the conspiracy and the amount of drugs involved.

The probation office's presentence investigation report had noted that the conspiracy spanned 2003-2005. And, after commenting that Hitchcock had peddled Kinsella's drugs for 12-18 months, the report pegged the conspiracy's length at 18 months. Kinsella asked Judge Woodcock to find a 12-month conspiracy. But he never asked the Judge to say – and the Judge never said – where the 12-month period fit on the 2003-2005 time-line. Finding Hitchcock completely credible, Judge Woodcock put the conspiracy's length at 12 months because he thought that Hitchcock's "good faith" estimate about a 12-18 month conspiracy was somewhat sketchy.

Zeroing in on Hitchcock's drug-quantity testimony – that Kinsella had handed him 90-180 pills every 3-6 weeks, though sometimes they went more than 6 weeks between deals and 1 deal involved 270-300 pills – Judge Woodcock settled on numbers "favorable" to Kinsella:  7 total transactions during the year, 6 involving 90 pills each and 1 involving 270, which netted 810 tablets.  But he quickly added that he "easily" could have picked less defendant-friendly numbers – a 135-pill transaction every 4 weeks or so, for example, with a 300-pill deal added to the mix.

In any event, if each pill weighed 80 milligrams, Judge Woodcock said, then Kinsella was responsible for 64.8 grams of oxycodone (810 x 80 = 64,800 milligrams or 64.8 grams), which converted into a marijuana equivalent of 434.160 kilograms, which resulted in a base offense level of 28.  See USSG § 2D1.1(c)(6), cmt. n.10(B) (directing courts to convert quantities of certain drugs into equivalent units of marijuana for sentencing purposes), and cmt. n.10(E) (laying out the drug equivalency tables).  Even if the pills weighed 75 milligrams apiece, Kinsella's base offense level would still be 28, defense counsel conceded after re-checking the Judge's math – so that issue dropped out of consideration. Judge Woodcock then added 2 levels for obstruction of justice, resulting in a total offense level of 30.  Given the lack of any meaningful criminal history, Judge Woodcock's calculations produced a guideline sentencing range of 97-121 months.  The Judge then

sentenced him to 97 months in prison plus three years of supervised release.

Further details will be noted as needed.

## ANALYSIS

With pretty strong cases against him, Kinsella does not attack the adequacy of the evidence underlying either conviction. Instead he contends that three instances of alleged prosecutorial misconduct – pivoting on the prosecutor's redirect of Hitchcock and closing-argument comments at each trial – robbed him of his fair-trial rights. He also insists that Judge Woodcock erred in his drug-quantity calculation and therefore selected an overly harsh sentence. We are not persuaded.

### Prosecutorial Misconduct

In our adversarial system of justice, litigants must alert trial courts to "error-in-the-making." United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987). The reasons behind this rule are simple. A timely objection lets the trial judge correct any errors to avoid needless reversals and remands. See, e.g., United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004). It also deters "sandbagging" lawyers from hiding objections below so that they can surface them on appeal if the jury does not acquit. See, e.g., United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995). Like most rules, this rule has an exception: a defendant can pursue an unpreserved claim on appeal under the difficult-to-meet plain-

-17-

error standard.  See, e.g., United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009).  That standard has three essential factors and one discretionary component.  The essentials are (1) error that (2) is obvious and (3) affected the outcome of the defendant's case.  See, e.g., United States v. Riccio, 529 F.3d 40, 45 (1st Cir. 2008).  Even if a defendant can show all of this, we have the discretion not to intervene if we conclude that the error does not distort the fairness or integrity of lower court proceedings in some extreme way.  See, e.g., United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004).

Because Kinsella's trial lawyer failed to preserve the prosecutorial-misconduct issues through timely objections, the plain-error standard controls.  The only slight wrinkle is that defense counsel did raise the redirect-examination issue in a new-trial motion.  But that is still an unpreserved claim, so the plain-error rule applies here too.  See United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008).  Ultimately, though, we see no reason to upset either verdict.  Cf. United States v. Shoup, 476 F.3d 38, 43 (1st Cir. 2007) (noting that "[a]ppellate reversal for plain error is extremely rare," adding that a defendant is not entitled to a "'perfect' trial").

### Redirect of Hitchcock – drug trial

Kinsella complains about the prosecutor's prompting Hitchcock to say on redirect that Judge Woodcock had sentenced him

-18-

in the same Bangor courtroom – testimony Kinsella says conveyed to the drug-trial jury that Judge Woodcock had already accepted Hitchcock's allegations as gospel.  To back up his claim, Kinsella contends that Judge Woodcock's "'once burned, twice shy'" comment – that Hitchcock would not perjure himself before the judge who had sentenced him – confirmed that the jury could infer that Hitchcock told the truth because the Judge had already heard his story and would spot any lies.  We see no error here, plain or otherwise.

At every turn, Kinsella's counsel urged the drug-trial jury to conclude that Hitchcock was a liar who did the government's bidding under the plea agreement to skirt a 20-year sentence.  To counteract this implication, the prosecutor used redirect to correct any impression that the <u>government</u> had decided Hitchcock's sentence – and rightly so.

Contrary to Kinsella's contention, we are not 100% certain that the prosecutor's question – "Do you remember who sentenced you?" – sought to elicit the Judge's name rather than the fact that a judge, not the government, had selected Hitchcock's sentence.  Regardless, the prosecutor never so much as hinted that Judge Woodcock had already heard Hitchcock's narrative or had found him credible, and the Judge's later instruction that Hitchcock may have lied to save himself undermines Kinsella's claim.  Also, the prosecutor did not follow up on the defense's recross of Hitchcock – which again intimated that Hitchcock's light sentence flowed from

-19-

his cooperation agreement – and did not touch on this supposedly improper issue during closing arguments. Finally, we see no problem with Judge Woodcock's "'once burned, twice shy'" statement: the plea agreement – admitted into evidence – reserved the prosecutor's right to charge Hitchcock with perjury if he testified falsely, and one can properly conclude that "a witness who has already agreed to testify against others would likely not jeopardize the potential benefits of providing such testimony – assuming it is truthful – by testifying untruthfully . . . ." United States v. Carr, 424 F.3d 213, 229 (2d Cir. 2005). Viewed in this light, we believe the prosecutor did not overstep his bounds here. See United States v. Sanchez, 251 F.3d 598, 603 (7th Cir. 2001) (not error for the prosecutor to stress during redirect-examination and closing argument that the trial judge, "Judge Young, not the government, would ultimately determine the sentence of each cooperating witness," holding that the prosecutor's actions "were invited by defense counsel's characterization of the sentencing process" and did not stray beyond the limits of fair advocacy). Consequently, there is no error at all, let alone plain error.[1]

---

[1] Like her trial counterpart, Kinsella's appellate lawyer attacks Hitchcock's credibility, suggesting that his account is simply not believable. But one cannot expect witnesses in a criminal case to "possess the credibility of people of the cloth, such as rabbis, [ministers], priests, and nuns; that is why one of the jury's roles is to decide the credibility of witnesses." United States v. Rovetuso, 768 F.2d 809, 818 (7th Cir. 1985). Ultimately, the jurors believed Hitchcock not because he is an upstanding citizen but because his testimony apparently resonated

## **Closing argument – bail-jumping trial**

Kinsella also accuses the prosecutor of misconduct during closing argument in the bail-jumping trial. As he sees things, the prosecutor talked about issues having nothing to do with his guilt or innocence, riling up the jurors by saying that this is an "important" case because our courts cannot function if criminal defendants can ignore promises made to judges, disregard court orders, and fail to appear as required. Kinsella's trial lawyer did not object, so we review for plain error, asking the usual questions, including whether Kinsella has shown both error and prejudice. See, e.g., United States v. Olano, 507 U.S. 725, 732-33 (1993). He has not.

Prosecutors can talk about "the importance of the case" in summation. United States v. Cotter, 425 F.2d 450, 452 (1st Cir. 1970) (emphasis added) (discussing the "basic ground rules" of closing arguments). But they cannot suggest that jurors have a civic duty to convict, see Viereck v. United States, 318 U.S. 236, 248 (1943), and the prosecutor skated perilously close to the edge with his courts-not-being-able-to-function comments. Troubled as we are by this, we conclude that Kinsella's plain-error claim still fails. We explain briefly.

The prosecutor's isolated remarks were not part of a concerted effort to incite the jury – they were introductory only,

---

with them.

setting up the litany of evidence against Kinsella that the prosecutor ticked off: Kinsella's repeated promises to return to court, his not calling the PSO as required, his staying in Canada on his re-arraignment day, his dogged attempts to avoid extradition, etc. Kinsella's guilt of bail-jumping is so clear that the prosecutor's passing remarks could not have swayed the trial's outcome. Also, defense counsel played down Kinsella's conduct throughout the trial – for example, counsel got PSO Maddox to admit on cross that he did not turn Kinsella in the second Kinsella stopped calling the PSO office, which suggested that the matter was not really important – and the prosecutor had the right to respond. See generally United States v. Paradis, 802 F.2d 553, 561 (1st Cir. 1986). Consequently, none of the challenged statements constitutes plain error in the context of this case. Cf. Taylor, 54 F.3d at 972 (emphasizing that the plain-error doctrine focuses on "'blockbuster[]'" errors, not on routine miscues that may tarnish the trial record); United States v. Sepulveda, 15 F.3d 1161, 1188 (1st Cir. 1993) (similar).

### Closing argument – drug trial

Kinsella also criticizes the prosecutor's drug-trial summation, which, he says, discussed a matter not in evidence – namely, that Kinsella had tried to sell OxyContin from jail. Kinsella is right. Discussing the recorded calls from jail, the prosecutor said they showed that Kinsella wanted to "off-load Oxy"

-22-

to make bail – but there was <u>nothing</u> in the tapes about that. Undaunted, the government tries to soft-pedal this problem by calling the prosecutor's comment "ambiguous" and reminding us that we cannot carelessly infer that a prosecutor intended an enigmatic remark to have its most damaging meaning. This is just plain wrong. There is <u>no</u> ambiguity in what the prosecutor said (the prosecutor's words could not have been plainer or more explicit), and what he said had <u>no</u> record support. Kinsella's trial lawyer did not object, however, so the plain-error standard again takes center stage.

A prosecutor's mission is not simply to rack up victories, "but to win fairly, staying well within the rules." <u>United States</u> v. <u>Kojayan</u>, 8 F.3d 1315, 1323 (9th Cir. 1993); <u>accord</u> <u>United States</u> v. <u>Rodriguez-Estrada</u>, 877 F.2d 153, 158-59 (1st Cir. 1989). Here, the prosecutor strayed into a forbidden zone by discussing something not in evidence. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>de Leon Davis</u>, 914 F.2d 340, 345 (1st Cir. 1990). But even the plainest of errors requires reversal only if the error caused prejudice and (if not fixed) a miscarriage of justice. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Hilario-Hilario</u>, 529 F.3d 65, 76 (1st Cir. 2008). Kinsella can show neither here.

Calling the government's case "thin," Kinsella contends that the prosecutor's unsupported comment had to have influenced the jury's verdict. But the evidence against him – the controlled drug buys, the phone records, the taped conversations veiled in code,

etc., much of which corroborated Hitchcock's account – was compelling enough. Critically, too, the prosecutor's line-crossing comment was a single <u>unobjected-to</u> sentence from a four-day trial, occurring after Judge Woodcock had told the jurors not to consider counsel's arguments as evidence. <u>Compare</u> <u>United States</u> v. <u>Procopio</u>, 88 F.3d 21, 31 (1st Cir. 1996) (explaining that the defense's failure to object may indicate "that, in the conditions of the courtroom, the passage in question passed by as mere rhetoric") <u>with</u> <u>United States</u> v. <u>Robinson</u>, 473 F.3d 387, 398 (1st Cir. 2007) (noting that the district judge's "general instructions" that jurors could not consider closing arguments as evidence undercut the defense's plain-error claim). Given all this, we conclude that the prosecutor's improper remark does not merit reversal on plain-error review.

### Drug-Quantity Calculation

Moving from conviction to sentence, Kinsella contends that Judge Woodcock's drug-quantity computation is doubly flawed: first because it held him culpable for 12 rather than 6 months of drug dealings, and second because it assigned 80 rather than 75 milligrams of oxycodone to each pill. The government counters that Kinsella forfeited the 6 vs. 12 months argument and waived the 75 vs. 80 milligram claim. <u>See</u> <u>generally</u> <u>Eisom</u>, 585 F.3d at 556 (stressing that waiver precludes review while forfeiture permits review, albeit only for plain error). Even if we assume for

-24-

argument's sake that Kinsella preserved both claims, see generally United States v. Webster, 54 F.3d 1, 5 (1st Cir. 1995) (taking a similar approach in an analogous situation), he still faces an uphill battle – and it is a battle that he cannot win.

The government need only prove drug amounts by a preponderance of the evidence, a district judge can make credibility calls, a drug-quantity calculation is a factual finding, and we review those findings deferentially, reversing only for clear error. See, e.g., United States v. Platte, 577 F.3d 387, 392-93 (1st Cir. 2009), cert. denied, 130 S. Ct. 1098 (2010); Sepulveda, 15 F.3d at 1198. Clear error is not an easy standard to meet: "[a]bsent a mistake of law" – and we see none here – we must respect the judge's findings "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." Platte, 577 F.3d at 392 (quotation marks omitted).

Calculating drug quantity is not a science, and a district judge tasked with this job is not required to be a mathematician or to make findings with computerized certainty. See, e.g., id. at 392-93. When there are no hard drug-quantity numbers, a reasoned estimate will do, and when the record supports more than one estimate, the judge's selection "from among plausible alternatives cannot be clearly erroneous." United States v. Morillo, 8 F.3d 864, 871 (1st Cir. 1993). Consistent with these principles, our job "is not to see whether there is any view of the

evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." United States v. Wade, 114 F.3d 103, 105 (7th Cir. 1997) (citing Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985)). And if the judge makes incorrect findings but the record still supports the end result, the error is harmless and no remand is needed. United States v. Correa-Alicea, 585 F.3d 484, 489 (1st Cir. 2009), cert. denied, 130 S. Ct. 1909 (2010).

In his briefs to us, Kinsella constructed an elaborate, multi-premised argument as to why Judge Woodcock clearly erred in his drug-quantity calculations. Kinsella agreed with the Judge's finding that the conspiracy lasted 12 months. But he told us that the conspiracy ran from December 2003 to December 2004 (the date of the last Kinsella-to-Hitchcock-to-Hopkins deal), even though the Judge did not find (and was not asked to find) where the 12-month term fit on the 2003-2005 time-line. Hitchcock testified that he only sold Kinsella's pills to Hopkins, and agents collared Hopkins in June 2004, which, Kinsella said, put Hopkins out of the drug-buying business for 6 months, until the December 2004 controlled buy. Putting it all together, Kinsella contended that Judge Woodcock's finding of 7 deals during the 12-month conspiracy could not stand because the Judge did not factor this 6-month hiatus into his drug-quantity analysis.

But Kinsella's counsel changed ground at oral argument, claiming for the first time that the 12-month period ran from February 2004 to February 2005 (the date of Hitchcock's arrest), a claim counsel repeated in a post-argument letter. That is too late. An appellant cannot surface at oral argument points omitted from the opening brief, see Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990), so we need only concern ourselves with the argument premised on the December 2003-December 2004 period.

The argument goes nowhere. Nothing in the record compelled Judge Woodcock – or compels us – to take so myopic a view of the conspiracy's duration. But even if we accept the December 2003-December 2004 argument, it is easy to come up with a pill total that supports the assigned base offense level of 28 without including the 6-month hiatus. Using variables that mirror the Judge's defendant-friendly findings – a deal roughly every 7 weeks, 1 involving 270 tablets and the rest involving 90 pills each – we get 5 pre-hiatus deals yielding 630 pills (270 + (4 x 90) = 630). Adding in the 90 pills from the December 2004 controlled buy ups the conspiracy's pill tally to 720. And throwing in the 100 pills from Kinsella's March 2005 arrest (which formed the basis of the possession-with-intent-to-distribute count on which he was convicted) brings the tablet total to 820 (10 more than the Judge found) – a total that still puts Kinsella in base offense level 28

regardless of whether each pill contained 75 or 80 milligrams of oxycodone.  Consequently, the sentence stands.

## CONCLUSION

For the reasons voiced above, we **<u>affirm</u>** Kinsella's convictions and sentence.

**<u>So ordered</u>**.