# United States Court of Appeals
## For the First Circuit

No. 08-1022

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES A. BUNCHAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

James M. Fox, for appellant.
Jack W. Pirozzolo, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief,
for appellee.

September 2, 2009

**LIPEZ**, **Circuit Judge**. Appellant James Bunchan masterminded a devastating pyramid scheme that stole nearly twenty million dollars from over five hundred people, most of them of Cambodian origin living in the United States. Following a jury trial, he was convicted of conspiracy, sixteen counts of mail fraud, and fifteen counts of money laundering. He was sentenced to a term of imprisonment of thirty-five years and ordered to pay restitution in the amount of $19,103,121.73. He now challenges: 1) his convictions, arguing that he was deprived of a fair trial due to the district court's restriction on impeachment of a government witness, and 2) the reasonableness of his sentence. We affirm.

**I.**

We recount the facts in the light most favorable to the jury's verdict. United States v. Gonzalez-Ramirez, 561 F.3d 22, 24 (1st Cir. 2009). Appellant was the founder, owner, and director of two "multilevel marketing companies," World Marketing Direct Selling ("WMDS") and Oneuniverseonline ("1UOL"). Bunchan represented to investors that the companies made a profit through selling cosmetics, health and diet supplements, and other products. In reality, the companies sold little of anything and generated money almost exclusively through the recruitment of new investors, or "members."

-2-

Appellant met co-defendant Seng Tan in 1999, around the time that he started WMDS, at a WMDS promotional seminar. Tan quickly became the principal recruiter of new investors, and was eventually given the title of "CEO Executive National Marketing Director" on WMDS and 1UOL promotional materials. Appellant and Tan were married in 2002.

Also in 1999, appellant met Christian Rochon, who was a neighbor in his apartment complex. He asked Rochon to help him create promotional materials for WMDS. Appellant, who is from Cambodia, said he wanted an "American face" for the company and soon made Rochon "President" of WMDS. (Rochon, who is originally from Canada, is Caucasian.) After taking Rochon to be professionally photographed, appellant put Rochon's photograph on WMDS's promotional materials. When 1UOL was created in about 2001, Rochon was also made "President" of that company.[1] Correspondence to investors often carried Rochon's name and signature, although Rochon was instructed not to interact with investors.

Appellant and Tan, who is also Cambodian, marketed investments in WMDS and 1UOL primarily to members of the Cambodian community living in the United States. Many of the investors spoke poor English and had little formal education. To recruit new

_____

[1] 1UOL was first presented to investors as the retail-store arm of WMDS's operation, whereby investors would open stores to sell WMDS products. Toward the end of the pyramid schemes, however, 1UOL was described as a passive investment vehicle, just like WMDS.

-3-

investors, appellant and Tan held informational seminars, usually hosted by Tan at the homes of investors. They often spoke to the prospective investors in Khmer, the Cambodian language, and emphasized their shared experiences as Cambodian immigrants.

Appellant and Tan represented that WMDS and 1UOL were profitable because they generated revenues from the sales of products, and that members earned commissions based on their sales. Investors could achieve different levels within the company, either by making sales, providing a lump-sum payment, recruiting new investors, or doing some combination of the three. For example, investors could skip the "Distributor" level -- and avoid the requirement of selling products -- by investing $26,347.86 and becoming a "Director I". "Director I's" were told that they would receive an immediate "bonus" of $2,797, followed by a $300 monthly payment for the rest of their lives and, some were told, through the lives of their children and grandchildren. Appellant created a document that described the "Director I" level to distribute at promotional seminars. The document read, in part:

> You will get $300.00 each and every month for the rest of your life and pass on down to your children after your death . . . You will see this money working for you while you are sleeping . . . . Our National Marketing Director of W.M.D.S., Inc., knowing exactly how you feel about your $26,347.86 which becomes a permanent investment with W.M.D.S. . . . you should not be worry [sic] about loosing [sic] your one [sic] of a life time $26,347.86 investment at all. W.M.D.S., Inc., has an absolute responsibility to take

-4-

> care you [sic] and your family for life.  Your investment can be inherited to your children and their generation to come . . . .  Because you are the owner of the W.M.D.S., Inc., it is completely different from investing in stock that will go up or down and loose [sic] money. . . .  Do not forget that you are a special person who has the best opportunity to meet this company first . . . .  W.M.D.S. urges you to sign up now or you will miss your best chance of fulfilling your American Dream.

Investors were also encouraged to become "Gold Directors" by investing $130,000 to $160,000.  Gold Directors were promised $2,500 in unending monthly payments.

Appellant and Tan encouraged people who did not have enough cash to borrow money by taking out second mortgages and home investment loans, and many investors did so.  The government submitted at sentencing that more than 150 people had secured mortgages or borrowed from their retirement accounts to finance their investments in WMDS or 1UOL.

Internal Revenue Service ("IRS") Special Agent Troy Niro testified at trial that while investors were contributing money to WMDS, appellant was using the company coffers like a personal bank account to pay for personal expenses and furnish a lavish lifestyle.  He owned several luxury cars, a home in Miami, Florida, and an expensive yacht named after himself (the "James B").  Other expenses reflecting his lavish lifestyle, as testified to by Agent Niro, included: $5,000 spent on hotel room service for two people in one night, $150,000 spent on diamonds, and $23,000 spent on

hairpieces.[2]  Between 2000 and 2005, appellant also spent over $3.8 million at casinos.  He often wrote large checks to casinos from company accounts containing investor funds, at one time writing a single check for $238,370 from the 1UOL account to a Las Vegas casino.[3]  Agent Niro's investigation revealed that Bunchan appropriated at least $3.7 million of investors' funds for himself and spent an additional $280,000 of investor money on his ex-wife and other family members.[4]  Appellant also kept family members, such as his ex-wife and his son, on the payroll of the company even though they did not work there.

Beginning in early 2005, Bunchan and Tan began having difficulties recruiting enough new members to meet WMDS and 1UOL's obligations to existing members.  By June 2005, the companies had altogether ceased making monthly payments to most of their investors, and investors began to complain.  On August 15, 2005, Bunchan had a letter sent to investors falsely blaming the delay on

---

[2] Appellant inappropriately labeled much of his spending, such as his children's tuition and tennis lessons, gambling, purchases from Louis Vuitton, and his hairpieces, as "business expenses" on company records.

[3] About $500,000 of the money appellant spent on casinos came from Bunchan's personal accounts, while the rest came from company accounts containing investor funds.  Of the $3.8 million spent on casinos, $1.2 million was sent back to appellant's personal bank account from the casinos; appellant later put some, but not all, of that money back into the companies' accounts.  Agent Niro was not able to identify any source of income to appellant during 2000-2005 other than WMDS and 1UOL.

[4] Approximately $500,000 of the investor funds went to Seng Tan and $300,000 to Christian Rochon.

-6-

technological problems and asking for investors' patience until September. In September, appellant directed that another letter be sent to investors, again blaming the delay on technological problems, and explaining that the company was installing "costly" new upgrades to its check-writing technology. Meanwhile, Tan told investors that the delay was caused by computer problems and, later, by a disruption in the companies' bank accounts caused by Hurricane Katrina. During this time, appellant hired attorneys to threaten investors who were complaining about their missed payments. The letters stated, in part, "[Y]our continued interference with WMDS and 1UOL's business affairs will be met with the full force of the law and WMDS and 1UOL will make you pay for your transgressions with all of your personal assets, including your personal residence."

In mid-November 2005, appellant, Tan, and Rochon were arrested by the federal authorities for mail fraud due to their activities with WMDS and 1UOL. While in jail awaiting trial, appellant initiated a murder-for-hire plot that targeted people he believed might testify against him, such as Rochon, several investors who had vociferously complained, and eventually the Assistant United States Attorney prosecuting his case. Appellant discussed his intentions with another inmate, who eventually notified the authorities and agreed to cooperate as a confidential informant in an undercover investigation. In the course of the

investigation, undercover operators gave appellant the name of a "hit man," actually an undercover FBI agent, to whom appellant mailed a list of people he wanted killed. He had grouped his targets into three tiers, in order of priority, and included the prices he was willing to pay for each "hit" (ranging from $10,000 to $20,000). The FBI also recorded a conversation between the confidential informant and appellant in which appellant explained that he also wished the hired killer to assassinate the spouses and children of several people named on the list.[5]

A federal grand jury returned a second superseding indictment against appellant, Tan, and Rochon on August 17, 2006. Appellant was indicted on all forty counts of the indictment, which included one count of conspiracy in violation of 18 U.S.C. § 371, twenty-four counts of mail fraud in violation of 18 U.S.C. § 1341, and fifteen counts of engaging in monetary transactions in proceeds of an unlawful activity, a form of money laundering, in violation of 18 U.S.C. § 1957. On June 4, 2007, the first day of trial, Rochon agreed to plead guilty to seven counts of the indictment, including the conspiracy count, some mail fraud counts, and some

---

[5] On May 4, 2009, following a jury trial, appellant was separately convicted in the District Court of Massachusetts of using a facility of interstate commerce to commit murder-for-hire, 18 U.S.C. § 1958, and solicitation of a crime of violence, 18 U.S.C. § 373, for this conduct. He was sentenced to twenty-five years imprisonment, with the first five years of that sentence to be served concurrently with his sentence in this case. United States v. Bunchan, No. 07-cr-10085-DPW (D. Mass.).

counts of engaging in monetary transactions in proceeds of an unlawful activity. Rochon testified for the government during the eleven-day jury trial. The jury convicted appellant of conspiracy, sixteen counts of mail fraud, and fifteen counts of money laundering. Tan was convicted of conspiracy, sixteen counts of mail fraud, and four counts of money laundering.[6]

The Office of Probation prepared a presentence report ("PSR") calculating appellant's base offense level ("BOL") at seven.[7] To this BOL, the PSR added: a twenty-level enhancement because the offense involved a loss of more than $7 million but less than $20 million (U.S.S.G. § 2B1.1(b)(1)(K)); a six-level enhancement because the offense involved more than 250 victims (U.S.S.G. § 2B1.1(b)(2)(C)); a six-level enhancement because the offense involved the use of sophisticated means (U.S.S.G. § 2B1.1(b)(9)(C)); a two-level enhancement because the offense substantially endangered the solvency or financial security of 100 or more victims (U.S.S.G. § 2B1.1(b)(13)(B)(iii))[8]; a two-level

_____

[6] Tan initiated an appeal to this court, but later moved to voluntarily dismiss the appeal pursuant to Federal Rule of Appellate Procedure 42. Her appeal was dismissed on September 5, 2007.

[7] The PSR applied the 2007 Guidelines, and we cite to those Guidelines.

[8] Although the endangerment of the solvency or financial security of 100 or more victims would normally occasion a four-level enhancement, U.S.S.G. § 2B1.1(b)(13)(B)(iii), the guidelines state that the cumulative adjustments from sections 2B1.1(b)(2) and 2B1.1(b)(13)(B) shall not exceed eight levels. U.S.S.G. § 2B1.1(b)(13)(C). Because a six-level enhancement was applied

enhancement for abuse of a position of trust (U.S.S.G. § 3B1.3); a four-level enhancement because appellant was the organizer of a criminal activity that was extensive (U.S.S.G. § 3B1.1(a)); a two-level enhancement because the offense targeted vulnerable victims (U.S.S.G. § 3A1.1(b)(1)); and, finally, a two-level enhancement for obstruction of justice because appellant initiated the murder-for-hire plot targeting witnesses against him and the prosecutor of his case (U.S.S.G. § 3C1.1). These enhancements produced a total offense level ("TOL") of forty-seven, which exceeds the highest TOL contemplated by the Sentencing Guidelines' sentencing table. The PSR placed appellant in Criminal History Category I ("CHC I"). The resultant Guideline Sentence Range ("GSR") was life imprisonment.

On November 28, 2007, the district court conducted a sentencing hearing in appellant's case. The government, noting that a TOL of forty-seven is "literally off the chart" because the maximum TOL contemplated by the Guideline sentencing table is forty-three,[9] nonetheless recommended that the court impose a below-guideline sentence of thirty-five years. Appellant argued that, due to his age (fifty-eight at the time of sentencing), even

---

pursuant to 2B1.1(b)(2), the Office of Probation only recommended a two-level enhancement pursuant to subsection (b)(13). (We note that as of the 2008 edition of the Guidelines, the enhancement for endangerment of the solvency or financial security of 100 or more victims is found at U.S.S.G. § 2B1.1.(b)(14)(iii)).

[9] No matter a defendant's CHC, the Guidelines prescribe "life" (and not a true sentencing range such as "360 months - life") for an offense level of forty-three.

a thirty-five year sentence was equivalent to "putting him in prison for the rest of his life," and would be disproportionate to the sentences in other financial fraud cases. He requested a maximum sentence of ten years of imprisonment. The district court accepted the government's recommendation and sentenced appellant to thirty-five years of imprisonment, to be followed by two years of supervised release, and restitution in the amount of $13,728,985.52, to be paid jointly and severally with Tan and Rochon. On February 14, 2008, the district court amended the judgment of restitution to $19,103,121.73, also to be paid jointly and severally with Tan and Rochon.

This appeal followed.

## II.

Appellant argues that he was deprived of a fair trial because the district court erroneously restricted his impeachment of a witness against him, Christian Rochon. We review the district court's evidentiary ruling restricting impeachment for abuse of discretion. United States v. Shinderman, 515 F.3d 5, 16 (1st Cir. 2008).

Appellant sought to cross-examine Rochon about criminal charges that were currently pending against him in Massachusetts state court for indecent assault and battery of a child. The charges alleged that Rochon had engaged in illegal sexual contact with his nephew, a minor. Before trial, the government sought to exclude reference to the state charges or, in the alternative, to

-11-

limit the inquiry about the charges. Appellant opposed the motion, arguing that the inquiry was permissible under Federal Rule of Evidence 608(b) as a specific instance of prior conduct relevant to the witness's character for truthfulness, and, further, relevant to show bias because Rochon might believe that he would receive better treatment on the state charges if he testified favorably for the United States in the federal criminal case.

Although the district court initially granted the government's motion to preclude the inquiry, it reconsidered its ruling at trial. After a voir dire of Rochon, the district court permitted appellant to examine Rochon about the pending state court assault charges but ordered that he could not inquire into the nature of the charges, stating "I am going to let you ask the question about whether there is an assault charge pending in the Attleboro District Court. I am not going to permit any reference to the nature of the assault. I find that far too prejudicial under Rule 403." Appellant challenges that ruling.

Federal Rule of Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because "Rule 403 judgments are typically battlefield determinations, and great deference is owed to the trial court's superior coign of vantage," Shinderman,

515 F.3d at 17, "[o]nly rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

We find no abuse of discretion in the district court's restriction of appellant's cross-examination of Rochon. The district court's ruling allowed appellant to raise the possibility that Rochon had a motive to ingratiate himself with the government by testifying against appellant. Appellant inquired into whether Rochon perceived that he would receive lighter treatment on the state charges if he testified favorably for the government. Exposing the nature of the pending state charges was not necessary to establish the potential of bias resulting from Rochon's expectations.

Furthermore, Rule 608(b) only permits inquiry into prior conduct if the conduct is probative of the witness's character for truthfulness or untruthfulness. The district court's determination that the nature of the sexual assault charges was not sufficiently probative of Rochon's character for truthfulness to outweigh the serious danger of prejudicing the jury against him was well within its discretion. See United States v. Span, 170 F.3d 798, 803 (7th Cir. 1999) (holding that the district court did not abuse its discretion in restricting impeachment of government witness to inquiry about the existence of felony charges against him when

-13-

restriction prohibited defendant from exposing that the charge was for first degree sexual assault of a child); United States v. Rabinowitz, 578 F.2d 910, 912 (2d Cir. 1978) ("We fail to see the logical relevance of the evidence sought to be adduced [--] prior acts of sodomy upon young children and consequent psychiatric treatment therefor [--] to the credibility of the witness.  The evidence's bearing on the witness's propensity to tell the truth was simply too tenuous for us to hold that the district judge abused his discretion in excluding it.").

Finding no error in the district court's limitations on cross-examination, we affirm appellant's conviction.[10]

**III.**

Appellant also challenges his sentence, arguing that it was unreasonable.  We review the reasonableness of a sentence "under a deferential abuse-of-discretion standard." Gall v. United States, 128 S.Ct. 586, 591 (2007).

In determining a sentence, district courts should first calculate a defendant's GSR, which "serve[s] as the sentencing court's 'starting point' or 'initial benchmark.'" United States v. Martin, 520 F.3d 87, 91 (1st Cir. 2008) (quoting Gall, 128 S.Ct. at

---

[10]    Although appellant tries to elevate his evidentiary argument to a constitutional claim under the Sixth Amendment right of confrontation, that argument is advanced so perfunctorily that we deem it waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  In any event, our analysis of the district court's appropriate exercise of its discretion answers any possible constitutional claim.

596). But "the sentencing court may not mechanically assume that the GSR frames the boundaries of a reasonable sentence in every case." Id. at 91. The court is obligated to consider whether a guideline sentence is appropriate, taking into account the factors set forth in 18 U.S.C. § 3553(a)(2) to ensure that the sentence is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Those factors include, inter alia, the seriousness of the offense, the need for deterrence, and the need "to protect the public from further crimes of the defendant."

The district court first calculated appellant's GSR -- life imprisonment -- and then varied downward from the GSR after considering the section 3553 factors and the recommendation of the government. Appellant argues that the district court should have varied further downward from the GSR. We conclude that the district court did not abuse its discretion in imposing a thirty-five-year term of imprisonment.

During trial and at sentencing, the district court heard several victims' stories of the crushing losses they suffered as a result of appellant's crime. For example, one victim explained at sentencing that he had lost $220,000 and his home and was living in a shelter without heat or a kitchen. Another victim testified at sentencing that due to her lost investment of $130,000 she had her car repossessed and was having trouble paying her mortgage. Another spoke of how she had invested $446,000 and now described herself as "homeless." Several other victims testified or had

their stories included in the PSR, but still their voices represented only a small fraction of the 500 people targeted by appellant's scheme. According to the PSR, over 150 victims had refinanced their homes or used retirement savings to make investments.

The district judge remarked at sentencing that he was "impressed with the large lack of remorse" on the part of appellant. He also noted that he had "considered the enormity of the harm done to the victims in this case" and further explained that:

> I have also been influenced by the fact that I agree having heard the government's case presented at trial, that the scheme at issue was a fraud . . . virtually from its inception. I have considered the particular vulnerability and susceptibility of the victims of the scheme to the appeals that were made to them based on ethnicity and a shared background of tragic life experiences . . . . I have also considered the flagrant manner in which the defendants, particularly Mr. Bunchan, diverted the proceeds of the scheme to their personal enrichment and amusement. I have considered the necessity of protecting the public and others from schemes like this in the future, which I believe calls for a high component of deterrence in any sentence imposed . . . . Finally, I respect, and ordinarily agree, with Mr. George's proportionality argument, which has persuaded me before in other sentencings. What makes Mr. Bunchan's case different, however, in my judgment, is his involvement and attempt to involve himself in the gravest form of obstruction of justice; the murder of witnesses and the prosecutor in the case. That, to a court system, is an absolutely

> unforgivable crime over and above the crimes
> for which the defendant is now convicted.[11]

Even after noting these aggravating aspects of appellant's case, the district court decided to accept the government's recommendation to vary downward from the GSR, sentencing appellant to thirty-five years of imprisonment. We recognize that, due to appellant's age, the thirty-five year sentence is practically equivalent to a life sentence, and that appellant has also been ordered to pay substantial restitution in addition to imprisonment. Nonetheless, we conclude that "[t]he sentence imposed here is grounded on a sensible (though not obligatory) view of the circumstances and the outcome -- given those circumstances and the length of the sentence actually imposed -- is plainly defensible." Martin, 520 F.3d at 96. There was no abuse of discretion in the district court's imposition of a thirty-

---

[11] Appellant makes a poorly developed argument that the district court improperly punished appellant "for attempted murder without jury trial and conviction, by way of the guidelines enhancement for obstruction of justice." This argument is waived because of its perfunctory quality. Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Nonetheless, we note that there was no error in the district court's finding of facts by a preponderance of the evidence to support the U.S.S.G. § 3C1.1 enhancement for obstruction of justice, as facts supporting such enhancements may be found by a preponderance of the evidence. See United States v. Gonsalves, 435 F.3d 64, 72 (1st Cir. 2006) ("[J]udicial fact-finding alone does not violate a defendant's sixth amendment rights so long as the defendant is sentenced at or below the statutory maximum for the offense of conviction.").

five year term of imprisonment, two years of supervised release, and restitution in the amount of $19,103,121.73.

Affirmed.