# United States Court of Appeals
## For the First Circuit

No. 09-2133

UNITED STATES OF AMERICA,

Appellee,

v.

DARIUS MANOR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lipez, Selya, and Thompson,
Circuit Judges.

James H. Budreau for appellant.
Theodore B. Heinrich, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

January 25, 2011

**THOMPSON, <u>Circuit Judge</u>**.  A melee at the movies led to Darius Manor's conviction for being a felon in possession of a firearm and ammunition.  <u>See</u> 18 U.S.C. § 922(g)(1).[1]  Manor appeals, claiming insufficiency of evidence and prosecutorial misconduct.  Detecting no error, we affirm.

## BACKGROUND

We recount the key facts in the light most compatible with the verdict, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Troy</u>, 618 F.3d 27, 29 (1st Cir. 2010), adding further facts as we discuss particular issues.

### The Chase

Catching a late-night movie at a Loews theater in downtown Boston, Gregoire Adrien heard two men arguing behind him. Tensions mounted, and one of the men asked the other if he wanted to "take it outside."  Adrien intervened, and one of the arguers – who turned out to be Manor – pointed a silver handgun at him.  "Why the hell would you pull a gun on me?" Adrien said as he rushed the gun-wielding Manor, pushing him through the theater doors and into the lobby.  Manor took off.  But Adrien stayed with him, pointing

---

[1] That statute provides in pertinent part:

It shall be unlawful . . . for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

him out to Boston police officer Troy Caisey, who was in the theater's third-floor lobby.

Telling Adrien to stay put, Caisey radioed dispatch with the particulars and ran after Manor. Caisey ordered Manor to stop. But Manor kept on going, racing down two escalators in the wrong direction. Importantly, Manor turned and looked back at Caisey once at the bottom of the second-floor escalator and again as he ran out of the building onto Tremont Street.

Caisey chased Manor down Tremont, radioing dispatch with the new details. Manor turned onto Boylston Street. Caisey was close, only fifteen yards behind him. He lost sight of him for a second or two and then spotted him on Tamworth Street, just off of Boylston. They were the only two there – but not for long.

Emerson College security officer Joseph Linscott heard Caisey's radio broadcast, headed to Tamworth, and saw Manor racing toward him. Linscott could not see Manor's face clearly (though he did catch a glimpse of it), but he could see Manor's stainless-steel gun plain as day. Drawing his revolver, Linscott ordered Manor to the ground. Manor refused, choosing instead to duck between two cars in a nearby parking lot – something Linscott and Caisey both saw. Linscott dropped down and noticed some movement underneath the cars. Both he and Caisey then saw Manor run out to the middle of Tamworth. Unwilling to go to the ground, Manor headed toward Linscott, screaming profanities. Linscott thought a fight might ensue. He was right. It was "one of the most

-3-

aggressive fights I've been in," Linscott later said. Linscott, Caisey, and others eventually cuffed and arrested the rampaging Manor. And Linscott found a loaded stainless-steel gun underneath a car that Manor had hidden behind, a gun Adrien later said looked like the one displayed in the theater.

## The Trial

Indicted under the felon-in-possession statute, Manor stipulated that he was a convicted felon and that the gun and ammunition found had moved through interstate commerce – which meant the only issue in play was whether he had knowingly possessed these items. See generally United States v. Scott, 564 F.3d 34, 39 (1st Cir. 2009) (discussing the elements of 18 U.S.C. § 922(g)(1)). Adrien, Caisey, and Linscott all testified. Manor did not and called no witnesses.

As indicated by defense counsel's cross-examination and summation tactics, Manor's main theory was that he had the bad luck of being in the parking lot at the wrong time. Saying the witnesses gave differing accounts of the gunman's attire and lost sight of the suspect during the chase, Manor insisted that the prosecution had not proved beyond a reasonable doubt that he was the person who had flashed a gun at Adrien in the theater and had dashed down Tamworth. But the jury did not buy Manor's mistaken-identity argument and so found him guilty. The district judge sentenced him to 92 months in prison, and this appeal followed.

-4-

**ANALYSIS**

**Sufficient Evidence? – Yes**

As he did below, Manor contends that the prosecution failed to prove beyond a reasonable doubt that he possessed the loaded gun recovered on Tamworth. But he faces obstacles that are too high to surmount. For starters, we review his claim de novo, surveying the evidence – direct and circumstantial – in the light most flattering to the prosecution's theory of the case. See, e.g., United States v. Guerra-Garcia, 336 F.3d 19, 22 (1st Cir. 2003). Resolving any credibility disputes against him, we must affirm if the record, so viewed, could have permitted a rational jury to find guilt beyond a reasonable doubt. See, e.g., United States v. Castro-Davis, 612 F.3d 53, 60 (1st Cir. 2010). Also, it matters not whether he can raise a plausible theory of innocence: if the record as a whole justifies a "judgment of conviction, it need not rule out other hypotheses more congenial to a finding of innocence." United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994).

With the proper standards in mind, we recap the volume of evidence against him. Caisey identified Manor as the person Adrien said had drawn a gun on him. Caisey also identified Manor as the person he had tracked from the theater and nabbed on Tamworth. Equally devastating to Manor, Linscott identified him as the gun-carrying malefactor he had seen on Tamworth. And all of this sinks

-5-

Manor's claim that no one identified him as the man who had fled the movies and raced to Tamworth.

Manor makes much of the fact that Caisey lost sight of the suspect on Boylston. Manor's counsel emphasized this to the jury, too. But Caisey testified that he only lost the suspect briefly, spotting him again seconds later on Tamworth. And, Caisey stressed, the person arrested on Tamworth had on the same clothes as the person chased from the theater. Linscott backed up Caisey's account, testifying that he had run into a person on Tamworth who fit the gunman's description to a T. Searching for a way around this, Manor essentially asks us to re-weigh the evidence and second-guess the jury's credibility decisions, but we can do neither. See, e.g., Castro-Davis, 612 F.3d at 60; United States v. Garcia-Pastrana, 584 F.3d 351, 367 (1st Cir. 2009).

Undeterred, Manor advances a similar argument when it comes to Linscott, suggesting that Linscott saw two people – one person (not Manor) tearing down Tamworth with a gun and another (Manor) popping up from between the two cars without a gun. But Linscott's testimony cuts the ground out from under Manor's claim. Telling the jury that he saw a man on Tamworth dressed as Caisey had described over the radio, Linscott then delivered a blow-by-blow account of what happened next: "I double-checked" to ensure that this was "the suspect," Linscott said. "I continued to look at him" and saw a gun in "his" hand. "As he was running," Linscott added, "[h]e was looking to the left where there was a parking lot

-6-

filled with cars. And he cut in between a couple of cars." Then the "suspect emerged from between the vehicles with his hands in the air." There is no way to read this testimony as saying Linscott saw two different people. Clinching matters, Linscott made clear during cross-examination that the man he saw scurry onto the lot with a gun and then reappear without one was Manor. Given this body of evidence, Manor's two-person theory is unpersuasive.

Manor also insists that certain inconsistencies in the witnesses' descriptions of the suspect's attire ruined the identification. Not so. Adrien, Casey, and Linscott gave essentially the same description. Adrien described the gunman as wearing a "scully" hat, a puffy gray coat, a white shirt, and blue jeans. Caisey described him as wearing a three-quarter length brown jacket, a white t-shirt, and blue jeans. And Linscott described him as wearing a three-quarter length dark jacket, a white t-shirt, and jeans. Caisey's account jibes perfectly with Linscott's, and Caisey's and Linscott's jibe nicely with Adrien's, too. The only difference is Adrien mentioned a hat and called the coat gray and puffy. No matter: neither Caisey nor Linscott said the suspect was hatless, and, most critically, the evidence confirms that Caisey tailed the very person Adrien had identified as the gunman. The nits Manor picks work best (if at all) before juries (his counsel argued these points to the jury, to no avail). But they hold no sway here. See, e.g., Garcia-Pastrana, 584 F.3d at 367; United States v. Thomas, 467 F.3d 49, 55 (1st Cir. 2006).

-7-

Finally, Manor contends that "uncontradicted evidence" in the form of a "booking" photo and sheet showed that he had on a blue t-shirt, jeans, and no coat – not the white t-shirt, jeans, and brown jacket ensemble that Caisey had described. Manor's lawyer asked Caisey about this on cross, handing him what counsel said was a booking photo and sheet. Caisey agreed that the photo showed Manor with a blue t-shirt and that the sheet did not mention a brown jacket. But he stressed that he was not there for Manor's booking. Manor's lawyer never had Caisey confirm that the photo and sheet were what the defense claimed they were, and he never offered them into evidence at any other point – which hardly makes these items the stuff from which to craft a winning sufficiency argument. Cf. generally Troy, 618 F.3d at 31 (stressing that a reviewing court's goal "is to ascertain whether the record evidence permitted a reasonable juror to find that each element of the crime charged was proven beyond a reasonable doubt") (emphasis added). In any event, after pondering Caisey's testimony, evaluating his credibility, and drawing the inferences of its choosing, the jury obviously rejected Manor's theory – and, at the risk of sounding like a broken record, we cannot second-guess that decision. See, e.g., Castro-Davis, 612 F.3d at 60. The net result, then, is that this argument goes nowhere.

That ends this aspect of the appeal. Given the standard of review, it is a rare occasion that we reverse a sufficiency ruling, United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006),

and we see no reason to reverse here. Eyeing the record as we must from the government's perspective, we conclude that a rational jury could have found Manor guilty of the felon-in-possession charge beyond a reasonable doubt. Consequently, his conviction stands.

### Prosecutorial Misconduct? – No

Evidence aside, Manor also complains about the government's closing argument, though he does not contend that the prosecutor engaged in bad-faith tactics. Here is what the prosecutor said:

> Officer Caisey told you that the man he was chasing in the theater was wearing a brown three-quarter length coat, a white T-shirt and blue jeans. He told you that he saw that man's face twice before he left the theater: once when that man looked back at him going from the second floor to the first floor, and then again as that man was leaving the theater on the first floor and going through the glass doors.

For clarity's sake, we will call that statement 1. The prosecutor then said:

> And, ladies and gentleman, Officer Caisey identified that man that he saw going from the second to the first floor, and he identified that man that he saw leaving the first floor of the Loews movie theater, and he identified him as the defendant, Darius Manor, here in court.

We will call that statement 2.

When the prosecutor finished, Manor's lawyer requested a sidebar. Zeroing in on statement 2, counsel claimed that the prosecutor had botched Caisey's testimony. "[M]y memory" of what

Caisey said, counsel stressed, was "that he could not identify the defendant from the theater but could identify him from the parking lot" on Tamworth.  "I think I actually cross-examined him on that point," he quickly added and then asked for a mistrial.  The prosecutor disagreed.[2]  And the district judge denied the motion, saying that even though he was not sure whether the prosecutor had

_____

[2] "Your Honor," the prosecutor said,

> on direct Officer Caisey testified that he saw Mr. Manor's face twice before he left the theater.  On cross, [defense counsel] asked him if he positively identified him in the theater . . . .  On redirect I cleared it up: "Did you see him twice when he left the theater?  <u>Is the man who left the theater here today?</u>"  He said yes to all of those questions.  I didn't go into detail.

(Emphasis ours.)  The government, to its credit, concedes that the prosecutor did not ask that last question, though his redirect of Caisey did point to the same conclusion:  noting that he had seen Manor's face and clothing in the theater, Caisey confirmed that the person arrested on Tamworth after the chase – wearing the <u>same</u> clothes – was Manor.

Manor never objected to the prosecutor's sidebar remark, but he plays it up now:  convinced that he has shown misconduct as to the closing, Manor argues that the prosecutor's sidebar misstep proves his closing misstatement was not an isolated gaffe and thus helps satisfy the prejudice component of the prosecutorial-misconduct equation.  <u>See</u> <u>generally</u> <u>United States</u> v. <u>De La Paz-Rentas</u>, 613 F.3d 18, 25 n.2 (1st Cir. 2010) (noting that we will find reversible error for preserved objections "only if we find that the prosecutor's remarks were both inappropriate and harmful," and stressing that harm turns "on the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (<u>i.e.,</u> whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions") (quotations omitted).  We doubt that the prosecutor's sidebar response somehow affected the verdict, particularly since it occurred at <u>sidebar</u>, <u>i.e.,</u> outside the jury's earshot.  But because we conclude that the prosecutor's closing was not improper, we need not wrestle with this or any of his other prejudice theories (more on that later).

-10-

misspoken, he would tell the jurors that their recollections and understandings of the testimony controlled, not what the lawyers said the evidence was.

Defense counsel focused on Caisey's testimony in his closing, arguing that there was less there than met the eye. The prosecutor responded in his rebuttal argument. And then the judge gave the promised instruction:

> Now in the closings [lawyers] try to, as I say, recall [the evidence] for you and point it out, highlight some of it for you. There is no substitute, however, for your own collective understanding and appreciation of the evidence in the case.
>
> To the extent lawyers say something and you say, "Well, I'm not sure I heard it that way," it's your collective understanding of the evidence that controls your deliberations, not what somebody else may think the evidence was or was not. And so the lawyers' arguments certainly do not supply anything additional or different from what you have heard yourselves in the course of the evidence.

Manor raised no objection to the instruction given, opting instead to renew his motion for a mistrial keyed to his claim that statement 2 was inappropriate. "That's denied," the judge ruled.

Manor made a post-trial motion for a new trial, again calling statement 2 improper. Caisey did not say that he could identify Manor "as the man he had chased out of the theater," Manor's lawyer wrote, but rather said that he had seen Manor "in the parking lot on Tamworth Street." The judge denied that motion also.

-11-

Challenging both rulings, Manor insists that the judge should have ordered a mistrial below and that we should order a new trial now. Because Manor's counsel timely objected to the prosecutor's closing, see, e.g., United States v. Azubike, 504 F.3d 30, 39 n.9 (1st Cir. 2007), ordinary standards of review apply, see, e.g., De La Paz-Rentas, 613 F.3d at 25. Exercising de novo review, we consider whether the prosecutor's summation was improper and, if so, whether it was harmful. See, e.g., De La Paz-Rentas, 613 F.3d at 25 n.2. But we review the judge's decision denying Manor's mistrial and new-trial motions only for "manifest abuse of discretion," United States v. Potter, 463 F.3d 9, 22 (1st Cir. 2006) (quotations omitted), a famously deferential standard that recognizes that the district judge was best positioned to gauge whether the episode was serious enough to warrant a new trial, see, e.g., Arizona v. Washington, 434 U.S. 497, 514 (1978).[3]

As best we can tell, Manor's opening brief once again only targeted statement 2: declaring that the "first half of the above excerpt [i.e., statement 1] correctly state[d] the evidence," he contended that "the second half [i.e., statement 2] crosse[d] the line." But Manor flip-flopped positions in his reply brief: calling "the second portion" of the prosecutor's "remarks [i.e.,

_____

[3] There is a slight wrinkle that needs some smoothing out. The district judge denied Manor's new-trial motion without comment, which leaves us with two options: remand for an explanation or tackle the issue directly "if a reasonable basis supporting the order is made manifest on the record." United States v. Podolsky, 158 F.3d 12, 16 (1st Cir. 1998). We pick option two.

statement 2] offensive," he stressed that they were "vague enough" for the defense to "counter[]" with "a strong closing" and instead argued that the "real prejudice" emanated from the prosecutor's "preface [i.e., statement 1]."

This is no small matter.  By conceding in his reply that his lawyer's closing neutralized whatever prejudice might have resulted from statement 2, Manor undercut the very misconduct claim that he had raised in his initial brief.  Cf. United States v. Gentles, 619 F.3d 75, 81 (1st Cir. 2010) (stressing that "misconduct" alone is not enough for us to reverse a conviction – there must be "prejudice," too); De La Paz-Rentas, 613 F.3d at 25 n.2.  And by waiting until his reply brief to assail statement 1 directly (after not doing so below and specifically calling the comment "correct[]" in his principal brief), Manor waived that line of attack.[4]  See, e.g., United States v. Hall, 557 F.3d 15, 20 n.3 (1st Cir. 2009); United States v. Edgar, 82 F.3d 499, 510 (1st Cir. 1996); see also United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) (adding that "[p]assing allusions are not adequate to preserve an argument in either a trial or an appellate venue").

---

[4] Even if we considered Manor's late argument forfeited instead of waived, see United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (noting that forfeited issues are reviewable for plain error but waived ones ordinarily are not), we would find no plain error because (among other things) we see no error to begin with.  See generally United States v. McElroy, 587 F.3d 73, 78 (1st Cir. 2009) (discussing the components of the plain-error test).  We explain next why we see no error.

-13-

Even setting aside these problems, Manor's prosecutorial-misconduct claims still misfire because the prosecutor did <u>not</u> misstate the evidence.  We start with statement 1.

Manor contends that reasonable jurors could not infer that Caisey saw "Manor's face" twice in the theater.  But Caisey's testimony on this score was clear:

> Q. At any point, Officer Caisey, going from the third to the second floor or the second to the first floor, did you get a view of the individual's – what he was wearing, his face, anything else?
>
> A. At the bottom of the second floor escalator he turned and looked up, which is – I believe I yelled at him again to stop.

There is more:

> Q. Were you able to get another view of the suspect at the time that you left the actual theater and the chase went outside?
>
> A. As he was exiting through the glass doors he looked back again.

There is more still:

> Q. As you were chasing the suspect through the movie theater, what was he wearing?
>
> A. Brown three-quarter-length jacket, a white long T-shirt and blue jeans.
>
> Q. Did you see his face at some point when you were chasing him through the theater?
>
> A. When he was on the second level and I yelled down to him to stop, he looked up.

Manor suggests that Caisey's last answer did not answer the prosecutor's question and so counts for nothing.  We think it

-14-

was responsive.  And that answer along with his others, including the following, shows Caisey arrested the very person whose clothing and face he had seen as they flew through the theater:

> Q. Did you observe the suspect on Tamworth before the arrest, what was he wearing?
>
> A. Brown three-quarter-length jacket, white long T-shirt and blue jeans.
>
> Q. And when you arrested Mr. Manor on Tamworth, what was he wearing?
>
> A. Brown three-quarter-length jacket, white T-shirt and blue jeans.

Consequently, the prosecutor had enough evidentiary support to make statement 1 – which, ultimately, pours cold water on any statement 1-based prosecutorial-misconduct charge.  See, e.g., United States v. Henderson, 320 F.3d 92, 105 (1st Cir. 2003) (holding that prosecutors can ask jurors to draw inferences unfavorable to the defense); United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002) (similar).

Now on to statement 2.  Convinced that Caisey testified that he could only identify Manor in court based on what he had seen in the parking lot on Tamworth, Manor contends that the prosecutor stepped over the line when he said in closing that Caisey had fingered Manor as the man who had fled the theater.  The record and caselaw, however, establish exactly the opposite.

Consider Caisey's testimony on direct examination:

> Q. Officer Caisey, do you see in the courtroom today the individual that you first chased through the Loews Theater on January the 18th?

-15-

A. Yes.

Q. And subsequently arrested on Tamworth Street?

A. Yes.

Q. Could you identify that individual please?

A. Yes. It's Mr. Darius Manor, sitting there with the black colored shirt on.

We pause to repeat the obvious: Caisey did identify Manor at trial as the man he had pursued from the theater. Unfazed, Manor argues that Caisey's testimony on cross made this identification worthless. Here are the snippets from Caisey's cross that Manor pins his hopes on:

Q. Sir, when you were in the theater and Mr. Adrien pointed out this person who he said he had a gun, you wouldn't be able to identify that person based upon what you saw there, would you?

A. At that moment?

Q. Yeah.

A. Just by clothing.

Q. Just by the clothing. The same – really your identification of Mr. Manor today is that he's the person that was in the parking lot, that you arrested, correct?

A. Yes.

. . .

Q. Sir you're able to identify Mr. Manor's face today in the courtroom, based on your observations that you made in the parking lot that night, correct?

A. Yes.

-16-

Q. Not based upon the observations that you made in the movie theater, correct?

A. Yes.

Manor suggests that by saying "identified" in summation – i.e., that Caisey had "identified that man that he saw going from the second to the first floor, and he identified that man that he saw leaving the first floor of the Loews movie theater, and he identified him as the defendant, Darius Manor, here in court" – the prosecutor intimated an identification based solely on Manor's facial features. And, the argument continues, because Caisey did not base his in-court identification of the fleeing theater-goer on seeing the suspect's face (he based it on the culprit's attire), the prosecutor mischaracterized the evidence. This argument cannot stand up to close scrutiny, however.

The knockout blow is that the prosecutor never said in closing that Caisey had identified Manor by his facial characteristics. The prosecutor never came close to saying that – he simply said that Caisey had singled out Manor as the person he had chased through the theater. And that comment was firmly rooted in uncontradicted testimony. Once again, the real gist of Caisey's testimony is that the person he had collared on Tamworth was the same person he had chased from the theater, and the defense's cross did nothing to undercut that core point – a point Caisey drove home on re-direct. So, according to Caisey, the theater-fleer and the Tamworth-arrestee were one and the same – Manor. Of course, Caisey

did see Manor's face in the theater and certainly saw it at the parking lot, too. And, despite defense counsel's dogged persistence, Caisey never so much as intimated a possible suggestion that the person he had arrested was different from the person he had chased. In any event, the prosecutor's comment fell within the bounds of propriety. See, e.g., Martinez-Medina, 279 F.3d at 119 (finding no error in statements that "appear reasonably supported by the record or are within the prerogative of the prosecution to characterize the evidence presented at trial and argue certain inferences to the jury").

To recap, even if we elide over the briefing problems discussed above, Manor's misconduct challenge still fails because we see nothing objectionable about the prosecutor's closing. And because we see no misconduct, we need not address Manor's arguments concerning how the summation supposedly prejudiced him. The bottom line, then, is that the district judge did not abuse his discretion in denying Manor's mistrial and new-trial motions.

## CONCLUSION

For the reasons recounted above, we affirm Manor's conviction.

**So Ordered**.

-18-