# United States Court of Appeals
## For the First Circuit

No. 10-2091

UNITED STATES OF AMERICA,

Appellee,

v.

SENG TAN, a/k/a Seng Kim Srun, a/k/a Seng Srunk,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Stahl, and Thompson,
Circuit Judges.

Joshua L. Gordon, with whom Law Office of Joshua L. Gordon was on brief, for appellant.
Jack W. Pirozzolo, First Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellant.

March 23, 2012

**THOMPSON**, <u>Circuit Judge</u>.

## SETTING THE STAGE

A federal jury convicted James Bunchan and Seng Tan, a husband and wife team, of numerous mail-fraud, money-laundering, and conspiracy crimes committed in furtherance of a classic pyramid scheme that swindled some 500 people out of roughly $20,000,000 in the early to mid-2000s. <u>See</u> 18 U.S.C. §§ 1341, 1957, 371. Fellow scammer Christian Rochon pled guilty to similar charges on the first day of trial, and his testimony in the prosecution's case helped seal the couple's fate. We affirmed Bunchan's convictions in <u>United States</u> v. <u>Bunchan</u>, 580 F.3d 66, 67 (1st Cir. 2009), and now affirm Tan's. Before we explain why, we present the facts in the light most favorable to the verdict, <u>see</u> <u>id.</u>, borrowing freely from our earlier opinion in <u>Bunchan</u>.

## THE SCHEME

Bunchan founded and owned two self-styled multi-level marketing (MLM) companies – World Marketing Direct Selling (WMDS) and Oneuniverseonline (1UOL) – that supposedly made a mint selling health and dietary supplements. In a legit MLM venture – think Avon, Mary Kay, Amway (companies Tan had worked for) – each person who joins the sales force also becomes a recruiter who brings in other persons underneath her. But the venture survives by making money off of product sales, not off of new recruits. Not so with WMDS and 1UOL. Neither sold much of anything, and both raised gobs

of money almost exclusively by recruiting new investors, also called members.

Here is how it all worked. Bunchan tasked Tan with drumming up new members, something she was born to do, apparently. Both she and Bunchan are Cambodian émigrés. And they focused their recruitment efforts primarily on Cambodians living here, many of whom were first-generation Cambodian-Americans who had limited educations and spoke little English. As "CEO Executive National Marketing Director," Tan ran informational seminars for potential investors, meeting them at hotels, their homes, and elsewhere. She usually made quite an entrance, showing up in a chauffeur-driven Mercedes. And she spoke to the attendees in their native language (Khmer), stressing their common background too (including their shared experiences living in Cambodia during the murderous reign of the Khmer Rouge).

Tan's pitch was quite attractive. She and Bunchan were millionaires, she said, and the "gods" had sent her to make "the Cambodian people" millionaires too. She bragged about how profitable both companies were thanks to high product sales, which earned members at the "Distributor" level fantastic sales commissions. But a member did not have to sell a single item to make money, she explained. For a lump-sum payment of $26,347.86, an investor could skip the Distributor level, become a "Director I," and get an immediate "bonus" of $2,797, plus $300 every month

for the rest of her life, her children's lives, their children's lives, and so on.  Promotional pamphlets also promised investors that if they recruited more members and kicked in more money (any where from $130,000-$160,000), they could become "Gold Directors" and earn even higher never-ending monthly payouts (something like $2,500 a month).  And Tan urged persons short on cash to take out second mortgages or home-equity loans or to borrow money from their retirement accounts to finance their investments, and more than 150 people did.  She even had members sign forms so that the loan proceeds would be wired directly to WMDS or 1UOL.

When prospective investors asked her point-blank whether they had to sell company merchandise to get money, Tan answered no. She and Bunchan reduced their promises to writing, with Tan even signing letters guaranteeing monthly returns basically <u>forever</u>.[1]

---

[1] Without correcting spelling or other errors, we quote from a document covering the $26,347.86 lump-sum "investment" that Bunchan created and Tan discussed with investors:

> You will get $300.00 each and every month for the rest of your life and pass on down to your children after your death. . . .  Our National Marketing Director of [WMDS] knows exactly how you feel about your $26,347.86 which becomes a permanent investment with [WMDS]. . . .  You should not be worry about loosing your one of a life time $26,347.86 investment at all.  [WMDS] has an absolute responsibility to take care you and your family for life. Your investment can be inherited to your children and their generation to come. . . .  Because you are the owner of [WMDS] it is completely different from investing in stock that will go up or down and loose money . . . . [WMDS] urges you to sign up now or you will miss your best chance of fulfilling your American Dream.

(Capitalization in original removed.)  And we offer this snippet from one of Tan's many signed letters:

One member who got cold feet and asked for her investment back received a letter from Tan saying that she (Tan) would return her money if WMDS went belly up. At trial Tan claimed that she never made any promises like these, and when confronted on cross-examination with one of her many letters that showed just the opposite, she claimed that she did not have her glasses on when she signed it and so did not know what it said.

The scheme started out swimmingly. WMDS and 1UOL used newly-invested money to trick old investors into thinking that the good times were here to stay. Not knowing any better, members were ecstatic. Bunchan and Tan were too, obviously. And with cash pouring in, the pair used the companies' coffers as their own personal piggy bank. Bunchan lived lavishly – buying expensive cars, a fancy yacht, and a home in Miami; jet-setting to exciting vacation destinations; spending $150,000 on diamonds and $23,000 on hairpieces; and dropping over $3,800,000 at casinos throughout the country, including $238,370 in one day – mostly by siphoning money from investor-funded company accounts. Tan was no slouch when it came to blowing through investor money either (though she was not quite in Bunchan's league), spending thousands on designer clothes,

---

In acceptance of $150,000 1UOL promises to remit to Wayne Peterson the amount of $4400 beginning on October 15, 2005 and continuing every month for [his] life . . . . Upon [his] death . . . such payments shall be made to his estate.

for example.  Even the companies' "President," Christian Rochon, got in on the act.[2]

But Tan's promises were too good to be true.  She started having trouble signing up new investors.  So WMDS and 1UOL stopped mailing out the monthly checks.  Members revolted, naturally.  Tan tried to quell the uprising, blaming the "delay" on banking glitches caused by Hurricane Katrina and telling members that they would get their checks soon – out-and-out lies, the record reveals.  Worse still, after getting an earful from irate investors, Tan flew to Minnesota and raked in hundreds of thousands of dollars – bilking her son-in-law out of $150,000 and his friend out of $300,000 – making the same false promises of unending returns she had made before.  And she herself decided which lucky member would get a check from the new money – an ill-conceived stopgap measure, it turns out.

By the time the scam imploded, roughly 500 investors had lost a total of $20,000,000, give or take.  Tan's actions led to

---

[2] A high-school graduate, Rochon became president (in name only, though) for one reason, and one reason only:  Bunchan wanted an "American face" for his companies, and his neighbor Rochon (a Caucasian of Canadian decent) apparently fit the bill.  And after renting Rochon a suit jacket and taking him to a professional photographer, Bunchan had Rochon's photo plastered all over the companies' promotional pamphlets.

her arrest and indictment, then to her trial and conviction, and now to her appeal and this opinion.[3]

## TAN'S APPEAL

Tan offers many reasons for reversing her judgment of conviction. We group her various arguments into two broad categories: claims of insufficient evidence on certain counts and of a fatal variance between the conspiracy charged in the indictment and the proof at trial. None of her arguments has any merit, however.

## (1)
## The Sufficiency Issues

Challenging the sufficiency of the evidence is typically an uphill battle, with a tough standard. A defendant who has preserved the issue (like Tan) must convince us that even after crediting the prosecution's witnesses and ceding all reasonable inferences in its favor, no sensible jury could have convicted on the evidence presented. See, e.g., United States v. Aranjo, 603 F.3d 112, 116 (1st Cir. 2010). And raising a plausible theory of innocence does the defendant no good, because the issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt. See, e.g., United States v. Manor, 633 F.3d 11, 13-14 (1st Cir. 2011).

---

[3] A district judge sentenced Tan to 20 years in prison and 2 years of supervised release, and he also ordered her to pay $19,103,121.73 in restitution, jointly and severally with Bunchan and Rochon.

-7-

With this in mind, we turn to Tan's sufficiency claims, which we review de novo.  See, e.g., id. at 13.

### (a)
### Knowledge

As is fairly common in cases of this kind, see United States v. Griggs, 569 F.3d 341, 343 (7th Cir. 2009) (Posner, J.), Tan insists that she did not know that she was participating in a pyramid scam.  And, she says, because she had no knowledge of Bunchan's double-dealing, the evidence could not support her conspiracy, mail-fraud, and money-laundering convictions.[4]

Relying principally on her testimony at trial, Tan's no-knowledge argument runs something like this.  She neither owned nor ran WMDS or 1UOL.  She was not involved in their day-to-day operations either:  she did not set company policy, signed no company checks, and had no access to company financials – all of which shows that her "CEO" title was nothing more than an honorific.  She may have had a hand in deciding "which checks went out from WMDS/1UOL," but she did not have any say in who got "checks forming the mail fraud convictions."  Also, she had married Bunchan because she was lonely, not because she wanted in on his con game.  And because of cultural taboos, she never discussed

----

[4] Guilty knowledge is a state-of-mind requirement for each of these crimes.  See United States v. Yefsky, 994 F.2d 885, 890 (1st Cir. 1993) (conspiracy); United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (mail fraud); United States v. Bucci, 582 F.3d 108, 116 (1st Cir. 2009) (money laundering).

company "issues" with him. Ultimately, she had no reason to suspect that anything was "rotten" at either company, and she was as much a victim as the poor investors her husband had duped. Or so she argues.

But Tan's theory does not hold together, given the government-friendly standard of review. Witness after witness testified that Tan was the one who had met them at their homes and other locales; who had bedazzled them into believing that their lump-sum investments would get them and their heirs monthly checks till the end of time, all without their ever having to market or sell a single company product; who had tried to bluff them into thinking that everything was and would remain just great, even as she knew that the companies could not write them checks; and who had then scammed other innocents out of serious money using the same phony come-on – a desperate bid to pull the companies out of their death spiral. At least that is what a levelheaded jury could have concluded. And a large amount of documentary evidence – including documents that Tan herself either prepared or signed – backed up the witnesses' account and undermined Tan's. Critically, the jury also heard from Tan how honest MLM outfits pay persons for making sales, not just for recruiting new members – the exact opposite of WMDS/1UOL's business model. Critically too, Rochon told the jury that in the companies' last days Tan herself picked

which members would get checks from any money she pulled in from her last-gasp recruitment efforts.

Obviously, the jury did not believe Tan's no-knowledge defense. And having heard her and the other witnesses' testimony, observed their demeanor, and gauged their truthfulness, the jury was free to make that call. Tan basically wants us to re-do the jury's work. But that is not our job. See, e.g., Manor, 633 F.3d at 14 (collecting cases). And after doing what is our job – viewing the record in the light most flattering to the government, accepting all credibility choices and "reasonable inferences from the evidence (whether or not inevitable)" that tend to support the government's theory of the case, United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) – we hold without difficulty that a rational jury could have found not only that Tan knew the material facts of this scam but also that she played a key role in it. So her no-knowledge argument goes nowhere.[5]

---

[5] The government also argues that the evidence supports an inference that Tan deliberately closed her eyes to the true facts – ostrich-like behavior that also supports an inference of actual knowledge. See, e.g., United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009) (discussing a willful-blindness scenario). But because there was sufficient evidence that Tan had actual knowledge, we can skip over that issue.

**(b)**
**Money Laundering**

Tan has two more insufficient-evidence claims, both of which target her money-laundering convictions under 18 U.S.C. § 1957.[6] Neither persuades, however.

Section 1957 criminalizes "knowingly engag[ing] . . . in a monetary transaction" involving "property of a value greater than $10,000" that was "criminally derived" from certain specified offenses, including mail fraud. See id. § 1957(a), (f)(2)-(3); id. § 1956(c)(7)(A). This proviso makes bank dealings risky business for persons who have scored money from certain illegal schemes – if they make a "deposit, withdrawal, [or] transfer" with this loot they will have broken that law too. See id. § 1957(f)(1) (defining "monetary transaction" broadly).

For starters, Tan argues that the underlying illegal activity here was mail fraud "for sending checks" to some of the persons cheated by the scammers. Oversimplifying slightly, the essential elements for mail fraud are a scheme to defraud that involves a use of the mail for the purpose of furthering the scheme. See, e.g., United States v. Stergios, 659 F.3d 127, 132-33

---

[6] Section 1957 has the title "Engaging in monetary transactions in property derived from specified unlawful activity." For easy reading, we will keep calling this crime a money-laundering crime, even though there is a separate federal crime for "[l]aundering of monetary instruments." See 18 U.S.C. § 1956; see generally United States v. Castellini, 392 F.3d 35, 45-46 (1st Cir. 2004) (labeling § 1957 a money-laundering statute).

(1st Cir. 2011) (providing a more detailed analysis). Jumping off from there, Tan says that a dividend payment cannot constitute criminally-derived proceeds – only getting "money can result in a proceed," she says. And so, she claims, "sending mail cannot form the predicate convictions from which money laundering proceeds can be derived."

Tan is wrong on a couple of levels. For one thing, her description of the record is not quite right. Her mail-fraud convictions were not limited to checks sent by mail – no, the jury also convicted her on multiple mail-fraud counts involving letters sent to investors in the hopes of keeping them from catching on to the fraud, e.g., communiqués promising members who had been stiffed out of their monthly checks that they could count on getting their money soon. For another thing, her argument clashes with the statutory mosaic because it confuses two concepts: a mailing in furtherance of a fraud and the proceeds of a fraud. The checks and letters that the scammers mailed to investors surely helped further the fraud, which made them the specified illegal activity required for a § 1957 conviction. And the proceeds of the fraud – the "criminally derived property," in § 1957 speak – were the millions upon millions of dollars that scammed investors handed over to the scammers. An IRS special agent traced millions of these millions to WMDS/1UOL bank accounts – accounts that the scammers raided for their own personal needs, which were the "transaction[s]" in mail-

fraud proceeds needed to cinch Tan's § 1957 conviction. Ultimately, then, this phase of her sufficiency offensive is a lost cause.

Tan does no better with her next attack – one that takes aim at her conviction on a money-laundering count involving a $255,090 check, dated December 10, 2004, written on a 1UOL account and payable to a Caesars casino. We will call this the "Caesars-check count" for simplicity. Tan's argument has three steps. First, Bunchan was a casino high-roller, but, she says, the evidence showed that she had nothing to do with his gambling or with his trips to Las Vegas. Second, the IRS special agent testified that Tan had not signed any of the WMDS or 1UOL checks that he had reviewed. And, finally, Bunchan had signed the check to Caesars, and there was nothing on that check "connecting" her to it. Adding everything together, she writes, leads to one conclusion – "no evidence" supports the guilty verdict on the Caesars-check count.

We see things differently. True, Rochon testified that Tan did not gamble, and the government tells us that "no financial evidence" tied her "directly" to the use of investor funds on gambling. Perhaps that is why the jury acquitted her on every other money-laundering count involving a check paid to a casino. But the evidence on the Caesars-check count was different. Consider what happened just days before Caesars deposited the

$255,090 check into its account. In early December 2004, Tan coaxed an investor into writing two checks, one for $131,933 and the other for $300,000. The $300,000 check was unusual because it was a loan to 1UOL, apparently – we say "apparently" because the investor made the check out to 1UOL but added "For S. Tan" on the memo line. In any event, Tan offered the investor $7,000 if he would make the loan. Happy to oblige, the investor overnighted the checks to 1UOL on December 13. 1UOL's bank posted the checks to 1UOL's account on December 14. Without these two checks, 1UOL's account balance was $268,813.99, enough – but barely enough – to cover the $255,090 check to Caesars. With them, the account had plenty of money to cover that check, which Caesars then deposited on December 18.

Considering the evidence in the light most agreeable to the prosecution (as we must), we are confident that a rational jury could have found Tan guilty on the Caesars-check count, violating the money-laundering statute, at least as an aider and abetter if not as a principal. One who participates in a criminal venture and seeks by her actions to make it succeed can be convicted under an aiding-and-abetting theory. See, e.g., United States v. Bristol-Mártir, 570 F.3d 29, 39 (1st Cir. 2009) (explaining the concept); see also 18 U.S.C. § 2 (deeming aiders and abettors punishable as principals under federal criminal law). As a knowing member of this scam, Tan participated in a criminal adventure, and she aided

-14-

and abetted Bunchan's money laundering too, beguiling a member out of a pile of cash to help her husband pay off his Caesars debt with the $255,090 check.  Importantly, the judge had instructed the jury on the aiding-and-abetting theory of conviction, and, not surprisingly, the government plays up that theme here.  But Tan says nothing about aiding and abetting in her brief, giving us no reason why that doctrine should not apply.  The upshot of all this is that this aspect of her insufficiency argument misfires, just like the others.

**(2)**
**The Variance Issue**

With the sufficiency protests out of the way, we turn to Tan's claim that a prejudicial variance existed between indictment and proof on the mail-fraud-conspiracy count.  Her argument is simple.  That count, she says, only charged her with "receiv[ing]" items through the mail as part of the conspiracy, not with sending them.  But the trial evidence, she quickly adds, focused on an exactly opposite theory – that she had only "sent" items through the mail, not "received" them.  And, she continues, the jury convicted her on the substantive mail-fraud counts for "putting things in the mail, not taking them out . . . ."  For that point, she relies on the verdict form, which shows "guilty" on the substantive mail-fraud counts involving letters "mailed from 1UOL," "from WMDS," or "from 1UOL and WMDS."  Reaching her ultimate

-15-

crescendo, she insists that this discrepancy between the charge (receiving) and the evidence (sending) requires reversal.

A variance arises when what was alleged in the indictment differs materially from what was proved at trial. See, e.g., United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008). Not every variance calls for reversal, however. See id. A defendant must show that the variance prejudiced her first – say, by leaving her so in the dark about the charge against her that she could not prepare a defense or plead double jeopardy to stop a second prosecution for the same crime. Id. Variance arguments are often made but seldom succeed. And Tan's must overcome a significant obstacle: because she has débuted it here, our review is limited to plain error. See United States v. Edelkind, 467 F.3d 791, 796 (1st Cir. 2006). Plain error, of course, requires an appellant to "show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." Id. at 797. Proving plain error is incredibly difficult, see United States v. Shoup, 476 F.3d 38, 43 (1st Cir. 2007), and Tan cannot come close to proving it here.

Tan's prejudice theory turns entirely on her belief that the variance crippled her ability to defend against the charge. But in what way? Tan does not say. And we do not think that she was caught off guard in any way, given that the substantive mail-fraud counts (which carried higher penalties than the mail-fraud-

-16-

conspiracy count) charged her with both sending and receiving items via the mail.  The bottom line:  even if there were a material variance here – something we need not and do not decide – it did not prejudice Tan's substantial rights, much less do so plainly.[7]  Consequently, her variance claim collapses.

### SUMMING UP

Our review complete, we **<u>affirm</u>** Tan's judgment of conviction in all respects.

---

[7] Tan also hints at a variance between the indictment and the jury charge, noting that the judge told the jurors that the mail-fraud statute "prohibits the use of the mails," conceding that the instruction was literally correct as far as it went, but nevertheless blasting him for not differentiating "between the two directions – sending and receiving."  Her argument misses the mark for several reasons.  Our review of the instructions reveals that the judge explained to the jurors that the government had to prove beyond a reasonable doubt "that the use of the mail, on or about the dates alleged, was closely related to the scheme because [Tan] either received something in the mail or caused it to be mailed in an attempt to carry out or execute the scheme."  Also, Tan offers no assurance that she took the necessary steps below to preserve her point and provides no developed argument (<u>i.e.</u>, no discussion of on-point authority, for example) as to why this was error, let alone plain error.  We need say no more on this subject.  <u>See</u>, e.g., <u>United States</u> v. <u>González-Mercado</u>, 402 F.3d 294, 301-02 (1st Cir. 2005).